# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| THE WILLIAMS COMPANIES STOCKHOLDER LITIGATION | Consolidated C.A. No. 2020-0707-KSJM |

## MEMORANDUM OPINION

Date Submitted: February 5, 2021
Date Decided: February 26, 2021

Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, DE; Michael J. Barry, Christine M. Mackintosh, Kelly L. Tucker, GRANT & EISENHOFER P.A., Wilmington, DE; Mark Lebovitch, Thomas G. James, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, NY; Jeremy S. Friedman, David F.E. Tejtel, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, NY; *Counsel for Plaintiffs*.

William M. Lafferty, Kevin M. Coen, Lauren K. Neal, Sabrina M. Hendershot, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Andrew Ditchfield, Brian M. Burnovski, Mari Byrne, DAVIS POLK & WARDWELL LLP, New York, NY; *Counsel for Defendants The Williams Companies, Inc., Alan S. Armstrong, Stephen W. Bergstrom, Nancy K. Buese, Stephen I. Chazen, Charles I. Cogut, Michael A. Creel, Vicki L. Fuller, Peter A. Ragauss, Scott D. Sheffield, Murray D. Smith, and William H. Spence.*

Patricia R. Urban, Michael A. Weidinger, Megan Ix Brison, PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, DE; *Counsel for Defendant Computershare Trust Company, N.A.*

**McCORMICK, V.C.**

This litigation concerns the validity of a stockholder rights plan, or so-called "poison pill," a device that came to popularity in the 1980s as a response to front-end loaded, two-tiered tender offers. Coercive tender offers of the 1980s were "to takeovers what the forward pass was to Notre Dame football in the days of Knute Rockne,"[1] and a powerful offense required a powerful defense. Of all the defenses developed to fend off hostile takeovers, the poison pill was among the most muscular.[2] These bulwarks gained judicial imprimatur in 1985 when the Delaware Supreme Court upheld a poison pill as an anti-takeover device in *Moran v. Household International, Inc.*[3] *Moran* also established intermediate scrutiny under *Unocal* as the legal framework for reviewing stockholder challenges to poison pills.[4]

Poison pills metamorphosed post-*Moran*. The flip-over feature of the *Moran* pill was augmented by a flip-in feature.[5] After the adoption of state anti-takeover statutes,[6] trigger thresholds crept down from the 20% threshold of *Moran* to 15% and then to 10%

---

[1] Robert A. Prentice, *Front-End Loaded, Two-Tiered Tender Offers: An Examination of the Counterproductive Effects of a Mighty Offensive Weapon*, 39 Case W. Res. L. Rev. 389, 392 (1989).

[2] *See generally* Martin Lipton & Erica H. Steinberger, 1 *Takeovers & Freezeouts* § 6.03[4], at 6-58 (L. J. Press 2009); Prentice, *supra* note 1 at 412–13.

[3] *Moran v. Household Int'l., Inc.* (*Moran II*), 500 A.2d 1346 (Del. 1985).

[4] *Id.* at 1357; *see Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985).

[5] *See generally Stahl v. Apple Bancorp, Inc.*, 1990 WL 114222 (Del. Ch. Aug. 9, 1990) (validating flip-in poison pill).

[6] *See, e.g.*, 8 *Del. C.* § 203 (preventing stockholders from engaging in a tender or exchange offer for a period of three years after buying more than 15% of a corporation's stock unless certain criteria are met). *See generally* E. Norman Veasey, Jesse A. Finkelstein & Robert J. Shaughnessy, *The Delaware Takeover Law: Some Issues, Strategies and Comparisons*, 43 Bus. Law. 865, 868 (1988).

in some instances.[7]  The pill's initial success engendered mission creep.  Originally conceived as anti-takeover armaments, poison pills were redirected to address other corporate purposes such as protecting net operating loss assets.[8]  Recently, pills have been deployed to defend against stockholder activism.

The plaintiffs in this litigation challenge an anti-activist pill adopted by the board of directors of The Williams Companies, Inc. ("Williams" or the "Company") at the outset of the COVID-19 pandemic and amid a global oil price war.  The Williams pill is unprecedented in that it contains a more extreme combination of features than any pill previously evaluated by this court—a 5% trigger threshold, an expansive definition of "acting in concert," and a narrow definition of "passive investor."

*Unocal* calls for a two-part inquiry, asking first whether the board had reasonable grounds for identifying a threat to the corporate enterprise and second whether the response was reasonable in relation to the threat posed.[9]  The defendants identify three supposed threats:  first, the desire to prevent stockholder activism during a time of market uncertainty and a low stock price, although the Williams board was not aware of any specific activist

---

[7] *See generally* Marcel Kahan & Edward Rock, *Anti-Activist Poison Pills*, 99 B.U. L. Rev. 915, 922 (2019) [hereinafter *Anti-Activist Poison Pills*].

[8] *See, e.g.*, *Versata Enters., Inc. v. Selectica, Inc.*, 5 A.3d 586, 607 (Del. 2010) ("*Selectica II*") (validating an NOL pill).

[9] The second prong of *Unocal* looks first to whether the defensive measure is draconian, in the sense of being preclusive or coercive, before addressing whether the measure is in the range of reasonableness.  *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1387–88 (Del. 1995) (quoting *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 45–46 (Del. 1994)).  In this case, the plaintiffs do not argue that the rights plan is draconian, and thus this decision goes right to the proportionality analysis.

plays afoot; second, the apprehension that hypothetical activists might pursue "short-term" agendas or distract management from guiding Williams through uncertain times; and third, the concern that activists might stealthily and rapidly accumulate over 5% of Williams stock.

Of these three threats, the first two run contrary the tenet of Delaware law that directors cannot justify their actions by arguing that, without board intervention, the stockholders would vote erroneously out of ignorance or mistaken belief. This decision assumes for the sake of analysis that the third threat presents a legitimate corporate objective but concludes that the Company's response was not proportional and enjoins the Williams pill.

## I.     FACTUAL BACKGROUND

Trial took place over three days. The record comprises 206 trial exhibits, live testimony from four fact and three expert witnesses, deposition testimony from eight fact and three expert witnesses, and one-hundred stipulations of fact. These are the facts as the court finds them after trial.[10]

_____

[10] The Factual Background cites to: C.A. No. 2020-0707-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX" number); the trial transcript (Dkts. 111–13) ("Trial Tr."); and stipulated facts set forth in the Parties' Joint Pre-Trial Order (Dkt. 101) ("PTO"). The following witnesses testified at trial: Plaintiff Steven Wolosky; Defendants Charles I. Cogut, Murray D. Smith, Nancy K. Buese; Plaintiffs' expert Joseph Mills; and Defendants' experts Guhan Subramanian and Bruce Goldfarb. The parties relied on the deposition transcripts of the following witnesses: Williams' Chief Financial Officer John Chandler and Defendants Stephen W. Bergstrom, Vicki L. Fuller, and Murray D. Smith. *See* Dkt. 88, Notice of Lodging of Dep. Trs. Exs. C–G. The deposition transcripts using the witnesses' last names and "Dep. Tr."

3

## A. Williams and Its Board

Williams is a publicly traded Delaware corporation with its headquarters in Tulsa, Oklahoma.[11] It owns and operates natural gas infrastructure assets, including over 30,000 miles of pipelines and 28 processing facilities, and handles approximately 30% of the nation's natural gas volumes.[12]

At all times relevant to this decision, there were approximately 1.2 billion shares of Williams common stock outstanding. Based on the stock's trading price from March 2020 through the time of trial, Williams' market capitalization ranged from approximately $11.22 to $27.54 billion. About 50% of Williams' outstanding shares are owned by approximately twenty institutional investors.[13] Williams' largest three stockholders—Blackrock, Vanguard, and State Street—collectively hold almost a quarter of the Company's common stock.[14]

Williams' certificate of incorporation establishes a straight Board of Directors (the "Board") and provides "that directors shall be elected annually for terms of one year."[15] Williams stockholders have the right to remove directors without cause and to act by written consent.[16]

---

[11] PTO ¶ 14.

[12] JX-32 at 5; PTO ¶ 14.

[13] JX-156 ("Goldfarb Report") ¶¶ 22–24.

[14] Goldfarb Report ¶ 24. Each of BlackRock, Vanguard, and State Street filed a Schedule 13G with the SEC in connection with its stake in Williams. *Id.*

[15] JX-8 Art. FIFTH ¶ B, at 28 (May 20, 2010 Form 8-K).

[16] *See id.* ¶ C, at 28 (stating that the "stockholders shall not have the right to remove any one or all of the Directors except for cause and by . . . affirmative vote," but then stating

As of March 2020, the Board comprised twelve members—CEO Alan Armstrong and eleven outside directors. The complaint names as defendants Armstrong and ten of the outside directors—Stephen W. Bergstrom, Nancy K. Buese, Stephen I. Chazen, Charles I. Cogut, Michael A. Creel, Vicki L. Fuller, Peter A. Ragauss, Scott D. Sheffield, Murray D. Smith, and William H. Spence (collectively, the "Director Defendants").[17]

## B.    Williams' Prior Experience with Stockholder Activism

In late 2011, Soroban Capital Partners LLC (led by Eric Mandelblatt) ("Soroban") and Corvex Management LP (led by Keith Meister) ("Corvex") each acquired slightly less than 5% of Williams stock.[18]   Through a February 2014 agreement with Williams, Mandelblatt and Meister joined the Board.[19]

During their tenure, Mandelblatt and Meister were instrumental in pressing for a merger with Energy Transfer Equity LP.[20]   After the merger was terminated, six of the Board's thirteen members—including Mandelblatt and Meister—attempted to remove and

---

that "[t]he first sentence of this Paragraph C, shall be of no force and effect after the annual meeting of stockholder [sic] in 2013"); *see also* PTO ¶ 109 ("Williams' By-laws permit stockholders to remove members of the Board of Directors by written consent.").

[17] Dkt. 1, Unsworn Verified Compl. for Decl. and Inj. Relief ("Wolosky Compl."); JX-60 at 10–11, 16; PTO ¶¶ 15–25.  The eleventh outside director, non-party Kathleen Cooper, retired from the board and is not a defendant.  JX-60 at 16; Trial Tr. at 308:8–11 (Smith).

[18] PTO ¶ 27; JX-104; Trial Tr. 309:17–310:8 (Smith); Bergstrom Dep. Tr. 37:6–38:6.

[19] PTO ¶ 29.

[20] Smith Dep. Tr. 9:13–18, 87:7–88:14; Chandler Dep. Tr. at 104:23–105:11; Fuller Dep. Tr. at 83:7–9.

replace Armstrong as CEO.[21]   When this effort failed, those six directors resigned.[22] Meister then threatened a proxy fight to replace the entire Board,[23] but he agreed to stand down when Williams named three new independent directors—Bergstrom, Sheffield, and Spence.[24]  Bergstrom became Chair.

Management also underwent significant change.  Armstrong remained as CEO, but the Company hired several new executives, including CFO John D. Chandler and General Counsel T. Lane Wilson.[25]

Armstrong and Smith are the only two Director Defendants who served on the Board during the Soroban and Corvex era; the others joined the Board in either 2016 or 2018.[26] Smith found Soroban and Corvex's activism detrimental to the Company.[27]  Smith further felt that Soroban and Corvex pushed for short-term-value-enhancing agendas that were not aligned with the Board's long-term goals.[28]

## C.  Williams Stock Price Plummets

Before 2020, Williams stock price traded at a high of $24.04 and had been relatively stable over the preceding months.  In early 2020, however, the COVID-19 pandemic and

---

[21] PTO ¶ 30.

[22] *Id.*; Trial Tr. 312:7–23 (Smith).

[23] PTO ¶ 31; Trial Tr. 312:24–313:11 (Smith).

[24] PTO ¶ 31; Trial Tr. 313:12–19 (Smith); *id.* at 129:15–20 (Cogut).

[25] Trial Tr. 136:14–138:10 (Cogut); *see* JX-162 at 1–3.

[26] PTO ¶¶ 15–25 (listing the Director Defendants and the year in which each joined the Board).

[27] *See, e.g.*, Trial Tr. at 311:7–16, 314:1–17, 349:14–350:20 (Smith).

[28] *Id.* at 311:10–16 (Smith).

the ensuing oil price war between Saudi Arabia and Russia shocked the oil market and sent stock prices plummeting.

The COVID-19 pandemic hit first. On January 31, 2020, the Department of Health and Human Services "declared a public health emergency in response to the COVID-19 pandemic."[29] Williams stock price fell to $18.90 by the end of February 2020.[30] During this period, trading volume in Williams stock was high and fluctuated dramatically from day to day, indicating "a lot of unusual and short-term-type trading."[31]

The Board met on March 2, 2020, to discuss solutions for the declining stock price. Management and representatives from Morgan Stanley explained that the stock was approaching lows similar to those in 2010 and 2016, despite the fact that earnings were 25% higher and the Company was carrying significantly less debt.[32] The Board discussed a share repurchase program but opted to preserve liquidity and continue to de-leverage instead.[33]

Then came the oil price war. On March 8, 2020, Saudi Arabia cut prices in reaction to Russia's conduct at a March 2020 meeting of the Organization of the Petroleum

---

[29] PTO ¶ 34.

[30] *Id.* ¶ 36.

[31] Trial Tr. 538:19–539:1 (Buese).

[32] JX-34 at 1–2; JX-35 at 4 (noting that the Company's stock price was "approaching lows realized in 2010 and 2016 despite 25% higher earnings and >1 turn less of leverage during other market stresses").

[33] PTO ¶ 37; JX-34 at 1; JX-35 at 3–4; Trial Tr. 140:14–141:20 (Cogut); Chandler Dep. Tr. at 203:21–204:4; Fuller Dep. Tr. at 278:16–280:13; Bergstrom Dep. Tr. at 216:11–16.

Exporting Countries.[34]  The following day energy stocks "fell to their lowest levels in 15 years, dropping 20% in a single day."[35]  Williams stock price closed at $14.99 on March 9, 2020.[36]  By March 19, Williams stock price had fallen to approximately $11, which was close to a 55% decline since January 2020.[37]

### D.  Cogut's Plan

Around early March 2020, outside director Cogut conceived of an alternative to the repurchase program—a stockholder rights plan (the "Plan").[38]  Cogut, a retired lawyer who had led the M&A and private equity practices of a prominent New York law firm, had joined the Board in 2016.[39]  Cogut had helped clients adopt rights plans roughly a dozen times beginning in the 1980s.[40]

Cogut witnessed the evolution of poison pills throughout his career and described them at trial as "the nuclear weapon of corporate governance."[41]  He explained his understanding that the poison pill was historically designed to protect companies from

---

[34] PTO ¶¶ 38, 83.

[35] *Id.* ¶ 39 (internal quotation marks omitted).

[36] *Id.* ¶ 40; PTO Ex. A.

[37] PTO Ex. A; JX-157 ("Subramanian Report") ¶ 22 & n.48.

[38] A flip-in poison pill generally works as follows:  A company issues its stockholders rights that have nominal value unless somebody acquires an amount of shares above a specified triggering threshold, at which point the rights become exercisable, for everyone other than the acquiring persons, into common or equivalent shares worth more than the exercise price.  JX-155 ("Mills Report") ¶ 28.

[39] PTO ¶ 19; JX-60 at 27.

[40] JX-60 at 27; Trial Tr. at 53:5–17 (Cogut).

[41] Trial Tr. at 53:18–55:1, 114:10–12 (Cogut).

hostile takeovers and that they originated in response to front-end loaded, two-tier tender offers.[42]  Cogut knew that acceptable trigger thresholds had declined from 20% to 15%, with the occasional 10% trigger.[43]  As trigger levels shrank, the pills' uses expanded. Cogut observed that companies began using pills to protect their net operating losses ("NOLs") and not just as a takeover deterrent.[44]

Like many Delaware corporations, Williams had an "on-the-shelf" pill (the "Shelf Pill")—a rights plan that the Company could quickly adopt in the event a threat arose.  The Board considered a "refreshment" of the Shelf Pill every so often; the last such refreshment took place in October 2019.[45]  The Shelf Pill was geared towards a traditional change of control situation.[46]  None of the Company representatives could testify as to details of the Shelf Pill other than its existence, though Cogut testified that it likely had a trigger of 15% and certainly greater than 5%.[47]

Cogut was not concerned with a potential takeover or with NOLs.[48]  He felt that the "circumstances that existed because of the pandemic" warranted "a different type of pill."[49]

---

[42] *Id.* at 53:10–54:4 (Cogut).

[43] *Id*. at 54:15–18 (Cogut).

[44] *Id*. at 55:2–10 (Cogut).

[45] JX-27 at 1; JX-29 at 2.

[46] Trial Tr. at 563:17–564:6 (Buese).

[47] *Id.* at 58:15–59:5 (Cogut).

[48] *Id.* at 64:19–23, 69:12–70:16, 93:16–19 (Cogut).

[49] Trial Tr. at 65:5–8 (Cogut).

The "uncertainty" in the market required a solution that could "insulat[e]" management from activists "who were trying to influence the control of the company."[50]

Cogut suggested a rights plan to Wilson around March 2 when management was considering its share repurchase proposal.[51] Cogut's proposal "was not meant to deal with the same issues as the stock buyback" and was not fully developed—he simply recommended that "the concept [of a pill] should be considered" by management.[52] The goal was to prevent "[a]ny activism that would influence control over the company at an aggregate level above 5 percent."[53]

Cogut made no distinctions among types of activism.[54] He hoped to impose a "one-year moratorium" on activism of any type.[55] To accomplish this goal, he proposed "a shareholder rights agreement with a 5% triggering threshold, a one-year duration, and an exclusion for passive investors."[56]

---

[50] *Id.* at 69:8–70:16 (Cogut).

[51] *Id.* at 66:4–10 (Cogut).

[52] *Id.* at 65:19–24, 66:11–67:1 (Cogut).

[53] *Id.* at 70:20–71:5 (Cogut).

[54] *Id.* at 72:21–75:2 (Cogut).

[55] *Id.* at 118:11–18 (Cogut); *see also id.* at 154:22–155:23 (Cogut) ("I thought that the company would be best off if there was a limitation on the ability of opportunistic investors . . . who were interested in influencing control of the company, if there was a limitation on what they could do, limit their voice over this period of uncertainty.").

[56] PTO ¶ 44.

### E. Williams Management Proposes the Plan to the Board

After Cogut proposed the Plan, Wilson consulted with Davis Polk & Wardwell LLP ("Davis Polk"), the Company's outside counsel.[57] Davis Polk then revised the Shelf Pill and sent a draft to Wilson on March 11, 2020.[58]

After receiving the draft from Davis Polk, Wilson socialized the Plan among senior management including Armstrong. Cogut expected Armstrong to support the idea because he had "barely survived" Soroban and Corvex's "attempt to get him fired."[59]

Management liked the pill. At the time, Williams Director of Investor Relations & Treasury Brett Krieg had been looking for a way to "monitor the potential emergence of activists in this low price environment."[60]

On March 17, Wilson forwarded a draft pill to Cogut, along with Davis Polk's "explanation of changes."[61] Wilson noted that he, Armstrong, and Chandler were "all supportive of moving forward proactively."[62]

Wilson also asked Cogut to discuss the Plan with Bergstrom, who lacked any experience with poison pills.[63] Cogut emailed Bergstrom to express his "view that [Williams] should adopt a shareholders' rights plan with a 1 year term, a 5% threshold, and

---

[57] *See* JX-42 at 1–2.

[58] *Id.* at 1; JX-42; *see also* JX-176 at 1.

[59] Trial Tr. at 137:8–15 (Cogut); JX-40; JX-174.

[60] JX-172 at 3; *see also* JX-171 at 2.

[61] JX-42 at 1.

[62] *Id.*; *see also* JX-175.

[63] Trial Tr. at 75:3–77:17 (Cogut); Bergstrom Dep. Tr. at 29:16–30:7; JX-176 at 1.

11

an exception for 13g holders."[64]  Bergstrom agreed to discuss the Plan with Cogut the following morning.[65]

In the meantime, Armstrong, Bergstrom, and Wilson scheduled an emergency Board meeting to further evaluate Cogut's Plan.[66]  Wilson had also advised that holding two meetings would look better; he recommended scheduling a "second board meeting to approve, at least a day later, to show appropriate consideration by the Board."[67]

Cogut and Bergstrom spoke by phone on the morning of March 18.[68]  Bergstrom expressed concern about the Plan's novelty.  He was wary of the 5% trigger[69] and "had not joined the enthusiasm of management to proceed."[70]  During a call later that morning, Bergstrom expressed similar concerns to Wilson.[71]

## F.     The Board Calls an Urgent Meeting

The Board scheduled its first meeting for the evening of March 18.[72]  An agenda distributed to the Board prior to the meeting identified two discussion topics:  (i) the Plan, which the agenda gave forty minutes, and (ii) whether to hold the annual stockholder

---

[64] JX-41.

[65] *Id.*

[66] JX-176 at 1.

[67] JX-43 at 1; *see also* JX-47 at 1.

[68] *See* JX-41.

[69] Trial Tr. at 79:19–82:20 (Cogut).

[70] *Id.* at 76:14–21 (Cogut).

[71] JX-50; JX-52.

[72] PTO ¶ 46.  In the lead up to the meeting, stockholder activism was a topic of discussion in emails between Wilson, Davis Polk, and Morgan Stanley.  JX-50; JX-52.

meeting virtually, which the agenda gave twenty minutes.[73]   The agenda attached a presentation titled "Rights Plan Overview."[74]  The Board did not receive a draft of the Plan before or during the March 18 meeting.[75]

The meeting lasted approximately seventy-five minutes, with most of that time spent on the Plan.[76]  Representatives from Davis Polk and Morgan Stanley attended the meeting.[77]

During the meeting, Armstrong and Wilson delivered the presentation.[78]  The presentation identified the purposes of stockholder rights plans generally, the mechanics of rights plans, and their dilutive effects.[79]

Management's presentation explained that, generally, rights plans seek to:

- "Discourage unsolicited takeover attempts that do not offer an adequate price to all stockholders or are otherwise not in the best interests of the company and its stockholders;"

- "Discourage or prevent coercive or unfair takeover tactics" such as "acquisitions of control through open market purchases[,] 'street sweeps,'" or "coercive tender offers, including partial and two-tiered tender offers;"

- "Encourage bidders to negotiate with the Board;" and

---

[73] JX-54 at 1.

[74] *Id.* at 1–2.

[75] *See* PTO ¶ 55.

[76] JX-55 at 1, 4; PTO ¶ 51; *see also* Trial Tr. at 152:4–7 (Cogut); *id.* at 326:18–327:11 (Smith); *id.* at 551:11–17 (Buese).

[77] JX-56 at 1–2.

[78] Trial Tr. 554:4–9 (Buese); JX-54 at 1.

[79] *Id.* at 3–10.

13

- "Provide the Board with [the] opportunity to preserve existing, more advantageous strategies or to develop and implement superior alternatives."[80]

The next slide of the presentation explained that, generally, rights plans are not intended to:

- "Prevent all acquisitions;"

- "Deter fully priced and fairly structured offers;"

- "Prevent proxy contests for representation on Board;" or

- "[P]revent a group of unaffiliated hedge funds from acquiring meaningful positions . . . so long as they remain below the threshold."[81]

The presentation went on to identify "the board's duties."[82] It also noted certain "corporate governance matters," including the possibility of negative reactions from Institutional Shareholder Services Inc. ("ISS") and the press.[83]

The presentation did not discuss any proposed features specific to the Plan, although the minutes of the March 18 meeting reflect that the Board discussed a 5% trigger.[84]

In addition, the minutes of the March 18 meeting state that:

- Morgan Stanley "advised that, given the extremely unusual market volatility primarily arising from the uncertainty relating to the coronavirus outbreak and the disproportionate impact on the Company's common stock price . . . a Rights Plan is a valid consideration."

- Morgan Stanley advised that "in light of existing disclosure regimes, and high, volatile trading volumes, before the Company would have any insight

---

[80] *Id.* at 3.

[81] *Id.* at 4.

[82] *Id.* at 11–15.

[83] *Id.* at 16.

[84] JX-56 at 2.

or knowledge, an opportunistic investor could acquire a sizable position in the Company's common stock."

- Armstrong stated "that the adoption of a Rights Plan would protect and preserve the interests of long-term shareholders."

- The Board discussed "protecting long-term shareholders (especially by exempting all passive investors from the contemplated plan)."[85]

The Board also discussed the "market perception" and the anticipated reaction of its stockholders, the press, and proxy advisory firms to the proposed Plan.[86] The directors concluded that "further explanation to shareholders" could overcome bad publicity given "the one year term and other . . . mitigating factors in respect of any potential negative investor reaction."[87]

Although the Board had not yet seen a draft of the Plan, by the end of the March 18 meeting, the Board had decided to adopt it. Buese stated that the Board had "unanimously" decided that its "fiduciary duty required [it] to take action in light of the significant dislocation of the stock" despite the "risk that shareholders could vote out a director" in response.[88] The only open issues were logistical questions and a formal vote.[89]

As recommended by Wilson, the Board scheduled a second meeting for the following day, the evening of March 19.[90] The Board briefly discussed transitioning its

---

[85] *Id.*

[86] *Id.*; JX-53 at 16; Trial Tr. at 550:20–551:10 (Buese); Fuller Dep. Tr. at 49:11–24, 59:13–60:24.

[87] JX-56 at 2; Trial Tr. at 546:11–16 (Buese).

[88] Trial Tr. at 551:4–10 (Buese).

[89] *See id.* at 550:20–551:10 (Buese).

[90] Trial Tr. at 153:4–11 (Cogut).

2020 Annual Meeting of Stockholders to a virtual setting before adjourning for the evening.[91]

### G.   The Board Adopts the Plan.

Immediately after the March 18 Board meeting, Williams corporate secretary Bob Riley emailed Computershare Trust Company, N.A. ("Computershare Trust") noting that "our Board will tomorrow adopt a shareholder rights plan" and asking to "chat tomorrow about Computershare's role as the rights agent."[92]  Later that evening, Riley emailed the agenda and materials for the meeting to the Board, including the Plan.[93]

On the morning of March 19, Williams filed its 2020 Proxy Statement in anticipation of its April 28, 2020 annual stockholder meeting.[94]  The Proxy Statement did not disclose that the Board was considering the Plan.[95]

An agenda was sent to the Board a few hours before the meeting.[96]  The agenda allocated sixty minutes to "[a]pproval" of a "Shareholder Rights Plan," including:  Morgan Stanley's presentation, discussion of the Plan, review of a draft Form 8-K and a Form 8A

---

[91] JX-56 at 2–4; Trial Tr. at 83:23–84:3, 152:4–7 (Cogut); *id.* at 551:11–17 (Buese).

[92] JX-58 at 1.

[93] JX-59; PTO ¶ 55.

[94] JX-60 at 4–5.

[95] *See* JX-60 at 7 (listing agenda items but not including information about the Plan).

[96] JX-65 at 1–2.

registration statement, adoption of resolutions approving the Plan, and review of a draft press release.[97]

The email also included a presentation prepared by Morgan Stanley.[98] Buese testified that she reviewed these materials and "touch[ed] base" with Bergstrom and Wilson prior to the March 19 Board meeting.[99] She did not review every detail but focused instead on key terms and provisions.

The March 19 Board meeting began at 6 p.m. with the full Board and representatives from Morgan Stanley and Davis Polk in attendance.[100] The Morgan Stanley team opened the meeting, beginning its presentation with an executive summary of the Plan before turning to "Considerations Regarding a 5% Trigger."[101] The executive summary stated:

> The *key benefit* of a rights plan is to prevent an opportunistic party from achieving a position of substantial influence or control without paying a control premium to other shareholders.
>
> A shareholder rights plan does not deter friendly or hostile M&A; however, an acquiror would be forced to negotiate with the Board.
>
> An activist would be limited in its ability to accumulate a large stake.[102]

---

[97] *Id.* at 2. The agenda is dated March 18, 2020. *Id.* Given its distribution on March 19, and the numerous differences from the March 18 agenda, this was likely a typo. *See* Buese Dep. Tr. at 205:10–206:13.

[98] JX-65 at 3; *see* Trial Tr. at 153:12–16 (Cogut); *id.* at 596:18–597:4 (Buese).

[99] Trial Tr. at 552:7–553:6 (Buese).

[100] JX-67 at 1.

[101] JX-65 at 4–5.

[102] *Id.* at 4 (emphasis added) (formatting altered).

17

The executive summary stated that "campaigns from well-known activists are expected to continue at a reasonable pace in the current market."[103] In connection with this prediction, the presentation stated that:

> The rights plan would deter an activist from taking advantage of the current market dislocation and challenges in monitoring unusual trading patterns that results in a rapid accumulation of a >5% stake.[104]

The presentation displayed a chart signaling an upward trend in stockholder activism and predicting that such activism would not decline as significantly as it did in response to the market downturn of 2008.[105]

As to the trigger, the presentation informed the Board that: (a) only 2% of rights plans had triggers below 10%; (b) 76% of rights plans "set the trigger" between 15% and 20%; and (c) "[n]o precedents exist below 5%."[106] The presentation did not cover any other provisions of the Plan.[107]

Morgan Stanley walked the Board through its generation of an exercise price for the warrants included in the Plan and the impact that triggering the Plan at that price would have on Company stock.[108]

---

[103] *Id.*

[104] *Id.*

[105] *Id.* at 8.

[106] *Id.* at 5.

[107] PTO ¶ 57; Chandler Dep. Tr. 146:15–148:3; *see also* Trial Tr. at 553:12–563:1 (Buese).

[108] *Id.* at 6–7.

The Morgan Stanley team concluded its presentation with some general market data regarding exercise price multiples.[109] It further identified a substantial decline in active rights plans among public companies—only 55 at the end of 2019, down from a high of 946 at the end of 2009.[110]

After delivering the presentation, the Morgan Stanley and Davis Polk representatives left the room to allow the Board to deliberate.[111] The minutes indicate that the Board discussed "recent market events and the impact on the Company's stock price."[112]

Cogut confirmed at trial that Morgan Stanley relayed the above information at the March 19 Board meeting. He regarded the information about other rights plan triggers "irrelevant" because "this was not a traditional shareholder rights plan."[113]

Buese recalled that the Board discussed the potential impact the Plan would have on the trading volume of Williams stock.[114] She further noted that the Board revisited "several levels of thresholds" and "the acting in concert concept."[115] Buese also recalled that the Board discussed the "the fact that ISS has a reasonably dim view of rights plans."[116]

---

[109] *Id.* at 11–14.

[110] *Id.* at 10.

[111] JX-67 at 1.

[112] *Id.* at 2.

[113] Trial Tr. at 87:22–90:1 (Cogut).

[114] *Id.* at 555:20–556:6 (Buese).

[115] *Id.* at 556:16–557:11 (Buese).

[116] *Id.* at 560:2–11 (Buese).

According to Buese, the Board collectively felt that "outreach and engagement and education" would temper any investor dissatisfaction.[117]

Following discussion, the Board unanimously resolved to adopt a stockholder rights plan "in substantially the form presented at the meeting."[118] The March 19 meeting, initially scheduled to last for one hour, adjourned after forty minutes.[119]

On March 20, 2020, the Company issued a press release that publicly disclosed the Board's adoption of the Plan (the "March 20 Press Release").[120] On March 30, 2020, the Company supplemented the 2020 Proxy Statement to disclose the Plan's adoption (the "March 30 Proxy Supplement").[121]

The Board elected not to subject the Plan to a stockholder vote. Cogut testified that the idea of allowing stockholders to vote on the Plan "was not raised" by Morgan Stanley, Davis Polk, or any of the Board members.[122] At trial, the Director Defendants cited time constraints as an additional consideration,[123] contending that the 2020 Proxy Statement "was at the printer" by the time the Board began discussing the Plan.[124]

---

[117] *Id.* at 561:21–562:6 (Buese).

[118] JX-67 at 2; Trial Tr. at 154:14–19 (Cogut); *id.* at 337:5–9 (Smith).

[119] JX-67 at 5.

[120] JX-69.

[121] JX-82.

[122] Trial Tr. at 118:8–119:8 (Cogut).

[123] *Id.* at 563:10–16 (Buese).

[124] *Id.* at 117:24–118:4 (Cogut).

## H. The Plan's Features

The Plan will expire at the end of one year and has four key features: (i) a 5% trigger; (ii) a definition of "acquiring person" that captures beneficial ownership as well as ownership of certain derivative interests, such as warrants and options; (iii) an "acting in concert" provision that extends to parallel conduct and includes a "daisy chain" concept (the "AIC Provision"); and (iv) a limited "passive investor" exemption.

While the Plan's features were a focal point of trial, they received little attention during the March 18 and March 19 Board meetings. The Director Defendants confirmed that Board discussions focused almost exclusively on the 5% trigger.[125] Although Buese recalls having discussed the concept of the AIC Provision,[126] other directors testified that the Board was informed only that the Plan would apply to groups of investors but did not review or discuss the actual terms of the AIC Provision.[127] Most directors admitted that they had not even read the key features of the Plan before this litigation began.[128]

The Plan operates in conjunction with regulatory requirements established by federal and state law. Understanding the Plan's features requires a quick refresher of certain of those requirements.

---

[125] *See id.* at 329:21–331:5 (Smith).

[126] *Id.* at 548:8–22 (Buese); *see also id.* at 568:8–569:8 (Buese) (testifying that she reviewed the AIC Provision prior to voting on the Plan). *But see* Buese Dep. Tr. at 225:1–228:21 (testifying that she has no recollection of having reviewed the AIC Provision but assumes that she did because it was her "common practice" to review Board materials).

[127] Trial Tr. at 95:17–96:13 (Cogut); *id.* at 345:5–21 (Smith); Bergstrom Dep. Tr. at 254:5–22, 293:6–294:10; Fuller Dep. Tr. at 74:5–77:7, 80:3–21.

[128] Trial Tr. at 87:1–15, (Cogut); *id.* at 345:2–7 (Smith); Bergstrom Dep. Tr. at 253:9–24, 272:6–273:13; Fuller Dep. Tr. at 74:5–77:7, 80:3–21.

- Section 13(d) of the Securities Exchange Act (the "Exchange Act") requires that non-passive investors report "beneficial ownership" of more than 5% of a class of stock but gives investors a ten-day window to report ownership levels using a Schedule 13D form. During that window, the investor is permitted to continue accumulating stock.

- Section 13(d) does not include derivative securities in the definition of "beneficial ownership."

- Section 13(d) aggregates the beneficial ownership of investors who are acting in concert, which under the Exchange Act occurs where "two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer."[129] Section 13(d)'s definition of "acting in concert" does not capture "parallel conduct" (discussed below) nor a "daisy chain" concept (discussed below).

- Section 13(d) excludes "passive investors," defined as persons who acquired "securities in the ordinary course of [their] business and not with the purpose nor with the effect of changing or influence the control of the issuer."[130]

### 1. The 5% Trigger

The Plan established a trigger threshold of "5% or more."[131] The Plan is triggered, and the rights distributed, on "the close of business on the tenth Business Day after" a "Person" (defined as an individual, firm, or entity)[132] acquires "beneficial ownership" of 5% or more of Williams stock or commences "a tender or exchange offer" that would result in their ownership reaching that threshold.[133] Given Williams' market capitalization in March 2020, triggering the 5% threshold at the time the Plan was adopted would have

---

[129] 17 C.F.R. § 240.13d–5(b)(1); *see also* Subramanian Report ¶ 41.

[130] *See generally* 17 C.F.R. § 240.13d-1.

[131] JX-69 at 22.

[132] *Id.*

[133] *Id.* at 21.

22

required an economic investment (sometimes referred to as a "toehold") of approximately $650 million.[134]

### 2. Beneficial Ownership Definition

The Plan's definition of "beneficial ownership" starts with the definition found in Rule 13d–3 of the Exchange Act, then extends more broadly to include "[c]ertain synthetic interests in securities created by derivative positions," such as warrants and options.[135]

### 3. The AIC Provision

The AIC Provision deems a Person to be "Acting in Concert" with another Person if:

> such Person knowingly acts (whether or not pursuant to an express agreement, arrangement or understanding) at any time after the first public announcement of the adoption of this Right Agreement, in concert or in parallel with such other Person, or towards a common goal with such other Person, relating to changing or influencing the control of the Company or in connection with or as a participant in any transaction having that purpose or effect, where (i) each Person is conscious of the other Person's conduct and this awareness is an element in their respective decision-making processes and (ii) at least one additional factor supports a determination by the Board that such Persons intended to act in concert or in parallel, which additional factors may include exchanging information, attending meetings, conducting discussions, or making or soliciting invitations to act in concert or in parallel.[136]

Breaking it down, the AIC Provision deems a Person to be "Acting in Concert" with another where the Person: (1) "knowingly acts . . . in concert or in parallel . . . or towards

---

[134] Subramanian Report ¶ 94.

[135] JX-69 at 3, 19.

[136] PTO ¶ 70; JX-69 at 18.

23

a common goal" with another; (2) if the goal "relat[es] to changing or influencing the control of the Company or [is] in connection with or as a participant in any transaction having that purpose or effect;" (3) where each Person is "conscious of the other Person's conduct" and "this awareness is an element in their respective decision-making processes;" and (4) there is the presence of at least one additional factor to be determined by the Board, "which additional factors may include exchanging information, attending meetings, conducting discussions, or making or soliciting invitations to act in concert or in parallel."[137] The fourth factor of this definition gives the Board "a great amount of latitude" for making the "Acting in Concert" determination.[138]

The "parallel-conduct" dimension of the "acting in concert" provision (sometimes referred to as a "wolfpack" provision)[139] is a feature of modern pills,[140] as Defendants' expert witness Professor Guhan Subramanian of Harvard Law School and Harvard Business School explained.[141] According to Subramanian, poison pills have always

---

[137] PTO ¶ 70; JX-69 at 18.

[138] Smith Dep. Tr. at 231:3–21, 248:15–24; Trial Tr. at 96:14–22 (Cogut); Mills Report ¶¶ 67–68.

[139] The phrase "wolfpacks" in this context refers to "a loose association of hedge funds that employs parallel activist strategies toward a target corporation while intentionally avoiding group status under [S]ection 13(d)." Subramanian Report ¶ 45 n.90 (quoting William R. Tevlin, *The Conscious Parallelism of Wolf Packs: Applying the Antitrust Conspiracy Framework to Section 13(D) Activist Group Formation*, 84 Fordham L. Rev. 2335, 2337 (2016)).

[140] Subramanian Report ¶¶ 48–49.

[141] Professor Subramanian is a recognized expert in corporate affairs and has been helpful to this court on many occasions. *In re Starz Appraisal*, 2018 WL 4922095, at *1 (Del. Ch. Oct. 10, 2018). His published work concerning policy questions of corporate law fills the footnotes of many decisions of Delaware courts. *See, e.g., In re CNX Gas Corp. S'holder*

24

included an acting-in-concert concept. Early poison pills required express agreements, using language that tracked the definitions of a "group," "affiliate," and "associate" under Section 13(d) and Rule 12b-2 of the Exchange Act.[142] Express agreement provisions do not capture so-called wolfpack activism achieved through "'conscious parallelism' that deliberately stop[s] short of an explicit agreement."[143]

The AIC Provision includes a "daisy chain" concept, providing that "[a] Person who is Acting in Concert with another Person shall be deemed to be Acting in Concert with any third party who is also Acting in Concert with such other Person."[144] Put differently, stockholders act in concert with one another by separately and independently "Acting in Concert" with the same third party.

---

*Litig.*, 2010 WL 2291842, at *7 n.4, *10 n.5 (Del. Ch. May 25, 2010); *In re CNX Gas Corp. S'holder Litig.*, 2010 WL 2705147, at *11 (Del. Ch. July 5, 2010); *In re MFW S'holders Litig.*, 67 A.3d 496, 501 n.3, 530 n.162 (Del. 2013); *In re Compellent Techs., Inc. S'holder Litig.*, 2011 WL 6382523, at *22 n.11 (Del. Ch. Dec. 9, 2011); *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 840 n.5, 844 n.6 (Del. Ch. 2011); *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1184 nn.44–45 (Del. 2015).

[142] Subramanian Report ¶ 41. Professor Subramanian notes that "under the Hart-Scott-Rodino (HSR) Act, any person wishing to buy more than $94 million of Williams common stock would have to disclose its position," thus imposing a constraint on "activist shareholders' trading of Williams stock well before the Williams Pill became relevant." *Id.* ¶ 96; *see* 15 U.S.C. § 18a. But HSR does not include a group concept and does not apply to the acquisition of nonvoting, derivative securities, such as stock options; the Plan thus casts a wider net than federal antitrust law.

[143] Subramanian Report ¶ 45.

[144] JX-69 at 18.

The AIC Provision does not apply to a public proxy solicitation or tender offer.[145] Persons are not deemed to be "Acting in Concert" solely as a result of soliciting proxies in connection with a "public proxy or consent solicitation made to more than 10 holders of shares of a class of stock" or when soliciting tenders pursuant to a "public tender or exchange offer."[146] While this provision allows stockholders to initiate a proxy contest and solicit proxies without triggering the Plan, it does not exempt routine communications among stockholder before the launch of a proxy contest or tender offer.

The AIC Provision is also asymmetrical. It excludes "actions by an officer or director of the Company acting in such capacities," such that incumbents can act in concert without suffering the consequences of the Plan.[147]

### 4. The Passive Investor Definition

The Plan carves out "Passive Investors" from the definition of "Acquiring Persons." The Plan defines "Passive Investor" to mean:

> [A] Person who (i) is the Beneficial Owner of Common Shares of the Company and either (a) has a Schedule 13G on file with the Securities and Exchange Commission pursuant to the requirements of Rule 13d-1(b) or (c) under the Exchange Act with respect to such holdings (and does not subsequently convert such filing to a Schedule 13D) or (b) has a Schedule 13D on file with the Securities and Exchange Commission and either has stated in its filing that it has no plan or proposal that

---

[145] *Id*. (excluding from the AIC Provision Persons "(a) making or receiving a solicitation of, or granting or receiving, revocable proxies or consents given in response to a public proxy or consent solicitation made to more than 10 [stockholders] . . . , or (b) soliciting or being solicited for tenders of, or tendering or receiving tenders of, securities in a public tender or exchange offer").

[146] *Id.*

[147] JX-69 at 18.

26

relates to or would result in any of the actions or events set forth in Item 4 of Schedule 13D or otherwise has no intent to seek control of the Company or has certified to the Company that it has no such plan, proposal or intent (other than by voting the shares of the Common Shares of the Company over which such Person has voting power), (ii) acquires Beneficial Ownership of Common Shares of the Company pursuant to trading activities undertaken in the ordinary course of such Person's business and not with the purpose nor the effect, either alone or in concert with any Person, of exercising the power to direct or cause the direction of the management and policies of the Company or of otherwise changing or influencing the control of the Company, nor in connection with or as a participant in any transaction having such purpose or effect, including any transaction subject to Rule 13d-3(b) of the Exchange Act, and (iii) in the case of clause (i)(b) only, does not amend either its Schedule 13D on file or its certification to the Company in a manner inconsistent with its representation that it has no plan or proposal that relates to or would result in any of the actions or events set forth in Item 4 of Schedule 13D or otherwise has no intent to seek control of the Company (other than by voting the Common Shares of the Company over which such Person has voting power).[148]

This carve-out was intended to ensure that truly passive investors would be exempt from the definition of Acquiring Person under the Plan.[149] Director Defendants testified as to their belief that the definition excludes Schedule 13G filers, defined under the Exchange Act as an investor that "acquired such securities in the ordinary course of his

---

[148] PTO ¶ 69; JX-69 at 22.

[149] Trial Tr. at 106:11–16 (Cogut); *id.* at 546:20–547:5, 567:11–19 (Buese); Fuller Dep. Tr. at 151:10–153:12; Chandler Dep. Tr. at 270:24–271:2, 286:24–288:23, 302:6–305:7; Bergstrom Dep. Tr. at 272:23–273:2; PTO ¶ 44.

business and not with the purpose nor with *the effect of changing or influencing the control of the issuer.*"[150]

As drafted, however, the carve-out is far more exclusive. The definition uses "and" before romanette (iii), which makes the three requirements of the provision conjunctive. Thus, a stockholder must meet all three conditions to qualify as an exempt "Passive Investor."[151] Consequently, the definition excludes *any* investor that seeks to "*direct or cause the direction of the management and policies of the Company*" as provided in romanette (ii) of the definition. The "management and policies" qualifier of the AIC Provision captures a broader range of activity other than the "changing or influencing . . . control" language applicable to Schedule 13G filers.[152]

As most of the defense witnesses testified, this conjunctive language appears to have been a mistake.[153] The intent was for the provisions to present two options: "(i) *or* (ii) and (iii)."[154] Yet, the Board never discussed nor corrected this error.[155]

---

[150] 17 C.F.R. § 240.13d-1(b)(1)(i) (emphasis added); *see* Trial Tr. at 106:11–16 (Cogut); *id.* at 566:23–567:19 (Buese); Smith Dep. Tr. at 215:21–216:3, 218:18–219:18; *see also* JX-161 ¶ 46 (Goldfarb Rebuttal Report).

[151] JX-159 ("Mills Rebuttal Report") ¶ 29.

[152] *See* Mills Report ¶¶ 28–33 (describing various forms of stockholder activism).

[153] *See* Trial Tr. at 107:3–109:15 (Cogut); *id.* at 606:9–607:13 (Buese); *see also id.* at 698:21–700:15 (Goldfarb). Subramanian stood out as the sole witness to read the Passive Investor Definition disjunctively, contending that the provision should be read as "(i) *or* (ii) and (iii)." *Id.* at 505:6–506:1 (Subramanian) (emphasis added). When confronted with its language he stood his ground, referring to a conjunctive reading of the provision as "just a red herring." *Id.* at 421:16–423:17, 504:21–506:20 (Subramanian).

[154] Trial Tr. at 505:6–506:1 (Subramanian) (emphasis added).

[155] *Id.* at 110:11–111:21 (Cogut).

Even a disjunctive reading of the Rights Plan's Passive Investor Definition is quite narrow.[156] At the time the Board adopted the Plan, Williams had only three 13G filers in its stock: BlackRock, Vanguard, and State Street.[157] Read disjunctively, the Passive Investor Definition would include at most those three investors.[158]

## I. Public Reaction to the Plan

The Board correctly anticipated that the market and stockholders would react negatively to the Plan.[159] Two of Williams' largest stockholders reached out regarding the Plan shortly after its announcement,[160] and ISS recommended in an April 8 report that stockholders vote against Bergstrom's re-election at the Company's annual meeting.

In recommending against Bergstrom's re-election, ISS cited "The board's adoption of a poison pill with a 5 percent trigger is problematic, as it is highly restrictive and could

---

[156] *Id.* at 109:11–110:4 (Cogut).

[157] *Id.* at 109:2–7 (Cogut); *id.* at 506:21–507:8 (Subramanian); *see also* Mills Report ¶¶ 37–39 (observing that the Plan's passive investor definition "impedes a wide range of socially beneficial and/or value-enhancing behavior common to many of the largest institutional investors, as well as routine discourse between and engagement among stockholders and management").

[158] Trial Tr. at 506:21–507:8 (Subramanian).

[159] *See* JX-56 at 2 (noting that the Board discussed a "potential negative investor reaction" to the Plan); Trial Tr. at 550:20–551:10 (Buese); *see also* JX-63 (Williams' management and investor relations teams anticipating the negative reaction to the Plan).

[160] *See* JX-73 at 2–3 (Blackrock emailing Krieg the same day that the Plan was publicly announced, stating that the Plan "doesn't look good from an ESG perspective. Has there been approaches? I think shareholders deserve to have transparency into any potential discussions even if they don't make LT [long-term] value creation sense . . . ."); JX-80 at 2–3 (Vanguard emailing Krieg on March 24, 2020, four days after the Plan was publicly announced, asking to "talk with the appropriate company representative about Vanguard's holdings as they relate to your company's Rights Agreement").

29

negatively impact the market for the company's shares as the market recovers."[161] ISS noted, "the pill was not a reaction to an actual threat – real or perceived – of an activist investor or hostile bidder."[162] ISS further opined that "the board did not appear to consider other alternatives," that "[w]hen ISS asked the company whether it had considered a shorter term, the answer appeared to be 'no,'" and that "[w]hen ISS asked the company whether it had considered adopting a more standard pill with a higher trigger and using its upcoming annual meeting to seek shareholder ratification of its 5 percent plan, the answer appeared to be 'no.'"[163]

After recognizing on April 7, 2020, that "initial votes [were] trending against" Bergstrom due to anti-Plan backlash,[164] Williams launched a stockholder outreach campaign to preserve Bergstrom's seat.[165] Williams engaged proxy soliciting firm Okapi Partners and met with stockholders in an attempt "to turn around some of the votes that ha[d] been cast and shore up the vote."[166]

On April 14, 2020, Williams management held an investors call. The talking points and agenda addressed the Plan's adoption:

---

[161] JX-91 at 15. Williams and ISS had communicated regarding the Plan between March 24 and April, and ISS shared a draft of its report with Williams on April 1.

[162] *Id*. at 16.

[163] *Id*. at 18.

[164] *Id.* at 1.

[165] *Id.*; JX-88; JX-90.

[166] JX-91 at 1; *see also* JX-108 (April 13, 2020 email from Wilson detailing a stockholder engagement game plan).

- Their stated "Rationale for Adoption" was to "[p]revent an opportunistic party from achieving substantial influence or control without paying a control premium to other stockholders."[167]

- They selected the 5% threshold because with "stock market prices so dislocated from fundamental values, a threshold above 5% would allow enormous accumulations by non-passive investors (all passive investors are exempt)" and because of the Company's "recent past experiences with activism," when "Corvex and Sorobon [sic] owned, either as beneficial owners or as economic interest owners, 9.96% of the Company's outstanding shares. Neither owned more than 5%."[168]

- "Many activist campaigns are conducted at levels below 10% ownership; a level higher than 5% simply does not protect a company against an opportunist."[169]

- "The Rights plan is intended to . . . reduce the likelihood of those seeking short-term gains taking advantage of current market conditions at the expense of the long-term interests of stockholders, or of any person or group gaining control of Williams through open market accumulation or other tactics without paying an appropriate control premium."[170]

- The Board selected a one-year duration because "[n]o one can predict the duration of the current crisis and the Board wants the management focused solely on the business, which the Rights Plan is intended to facilitate."[171]

In handwritten notes made to a print-out of the investors call agenda, Chandler wrote:

"limited scope → just activist."[172]

Wilson circulated the talking points and agenda to Bergstrom and others on April 14. In response, Bergstrom wrote:

---

[167] JX-187 at 3.

[168] *Id.*

[169] *Id.* at 6.

[170] *Id.*

[171] *Id.* at 7.

[172] *Id.* at 1.

31

Only thing is [sic] would add is we saw a 50 plus percent in stock price and a minimal decline in cash flow and business fundamentals. We don't talk about how our business didn't change. I use the term you have heard of throw the baby out with the bath water. In our case they threw the bathtub out as well. That is why we put it in place at that level because that is exactly the kind of situation people with bad intentions look for. Dislocation in market where fundamentals are incongruent with that situation.[173]

Williams gave a slide presentation during the April 14 investors call and disclosed the presentation the next day as a proxy supplement (the "April 15 Proxy Supplement"). The presentation stated that the disclosure was intended to explain "the Board's rationale for adopting the [Plan], the [Plan's] key terms, the Board's process in adopting the [Plan], and [the Company's] corporate governance practices generally."[174] It stated:

- "Our Board adopted a Rights Plan on March 19, 2020 after careful consideration. This action was taken: [i]n light of unprecedented market conditions and severe market declines [and] [i]n the best long-term interest of our stockholders."

- "Rationale and purpose of adoption: To prevent an opportunistic party from achieving substantial influence or control without paying a control premium to other stockholders."[175]

- "Company experience in recent past reinforced Board's view that 5% is the right threshold in this environment."[176]

At the April 28, 2020 annual meeting, the stockholders re-elected Bergstrom to the Board, but by a slim margin—only 67% of the shares were cast in favor of Bergstrom.[177]

---

[173] JX-114 at 10–11.

[174] JX-117 at 3.

[175] *Id.* at 5 (formatting altered).

[176] *Id.* at 7.

[177] Mills Report ¶ 76; JX-123 at 2.

As Director Chazen noted shortly after the vote, "no one should take great solace from the voting results," as "[a] third of the vote against [Bergstrom] is much larger than I would have guessed."[178] Fidelity Investments, which voted in support of all directors, emailed the Company to note that its support was cautionary: "I would encourage you to put the pill up for a shareholder vote next year if it is extended or we likely will hold directors accountable."[179]

### J. The Board Fails to Redeem the Plan.

The Board has the authority to redeem or amend the Plan, but it remains in place.[180]

At trial, Buese offered one reason for why the Board did not redeem the Plan. She speculated that doing so could send a signal "that the board believed we have achieved full and fair value for the share price," effectively setting "an artificial ceiling" on the value of Williams stock.[181] Buese admitted that she did not discuss this justification with any other director, vet it through advisors, or submit it for Board discussion.[182]

---

[178] JX-126 at 1.

[179] JX-127 at 3–4.

[180] JX-69 at 48–49; Trial Tr. at 611:3–6 (Buese).

[181] Trial Tr. at 571:21–572:9 (Buese). Professor Subramanian made the same claim. *See* Subramanian Report ¶ 76 (stating that "pills have signaling effects, and eliminating a pill when there is no clear reason to do so could fuel speculation in the marketplace, thus creating unnecessary disruption to the company"). The plaintiffs' expert disputes this. *See* Mills Rebuttal Report ¶ 46. The Board never considered the issue, so the experts' dispute is irrelevant.

[182] Trial Tr. at 611:21–612:14 (Buese).

In fact, outside of the context of privileged discussions concerning this litigation,[183] the Board never considered redeeming the Plan.[184] In post-trial briefing, the defendants claimed that maintaining the Plan was a business judgment duly considered by the Board— they asserted that "the evidence shows that members of the Board, and on one occasion, the Board as a whole, have considered whether to redeem the Plan and decided that it was not in the Company's best interests to do so."[185] The defendants, however, asserted privilege over the "one occasion" when the "Board as a whole" supposedly considered whether to redeem the Plan. Consequently, there is no factual record to support the defendants' claim.[186]

Meanwhile, Williams stock price has substantially recovered. By June 8, 2020, Williams stock price had returned to $21.58; it closed at $21.68 on August 24, 2020.[187] Third-quarter financial results for 2020 noted the "stability and predictability of business,"

---

[183] PTO ¶ 109, *see also* Trial Tr. at 120:22–121:15 (Cogut); *id.* at 355:21–356:9 (Smith); *id.* at 611:13–20 (Buese); Bergstrom Dep. Tr. at 84:7–85:18; Fuller Dep. Tr. 183:19–184:13, 202:16–203:17.

[184] PTO ¶ 109.

[185] Defs.' Opening Br. at 56.

[186] *Id*. Plaintiffs filed a motion *in limine* to preclude Defendants from relying on the Board communications over which Defendants asserted privilege. That motion is denied as unnecessary. Because Defendants blocked testimony as to this Board meeting at trial and in discovery, there is no factual record on which to base the finding they seek—that the Board considered whether to redeem the Plan and determined that not doing so was in the best interest of the Company.

[187] PTO ¶¶ 103–104.

and Armstrong touted the Company's strong performance "during a year marked by disruption and uncertainty."[188]

### K.     This Litigation

Plaintiff Steven Wolosky filed this litigation on August 27, 2020.  Plaintiff City of St. Clair Shores Police and Fire Retirement System (with Wolosky, "Plaintiffs") filed a similar action on September 3, 2020.  The court granted expedition on September 8 and consolidated the two actions on September 15.

The operative complaint asserts a direct claim for breach of fiduciary duty against the Director Defendants seeking declaratory and injunctive relief regarding the validity and enforceability of the Plan.  The Complaint also names as defendants the Company and Computershare Trust solely in its capacity as the rights agent for the Plan (together with the Director Defendants, "Defendants").[189]

On November 11, 2020, over Defendants' objection, the court certified a class defined as: "all record and beneficial holders of company common stock who held stock as of March 20, 2020, and who continue to hold stock through and including the date on which the rights plan expires or is withdrawn, redeemed, exercised or otherwise

---

[188] *Id.* ¶ 105.

[189] PTO ¶ 26.

eliminated," excluding Defendants.[190]  A three-day trial was held from January 12 to 14, 2021.  Post-trial briefing concluded on February 5, 2021.[191]

## II.    LEGAL ANALYSIS

Plaintiffs claim that the Director Defendants breached their fiduciary duties when adopting and maintaining the Plan.  This decision agrees and issues a mandatory injunction requiring redemption.

### A.    Direct Versus Derivative

The parties dispute whether Plaintiffs' claim is derivative or direct.  Plaintiffs argue that their claim is direct.  Defendants argue that Plaintiffs' claim is derivative and thus subject to Court of Chancery Rule 23.1, which requires Plaintiffs to either make a pre-suit demand on the Board or to demonstrate that demand would have been futile.  Plaintiffs did not make a pre-suit demand, and Defendants argue that Plaintiffs have failed to demonstrate demand futility, requiring judgment in Defendants' favor.

In 2004, the Delaware Supreme Court established a two-part test for determining whether claims are direct or derivative in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[192]

---

[190] Dkt. 78, Tr. of 11.18.20 Oral Arg. and Rulings of the Ct. on Pls.' Mot. for Class Certification Held Via Zoom at 41.

[191] *See* Dkt. 106, The Williams Defs.' Opening Post-Trial Br. ("Defs.' Opening Br."); Dkt. 107, Pls.' Post-Trial Br. ("Pls.' Opening Br."); Dkt. 115, The Williams Defs.' Answering Post-Trial Br. ("Defs.' Answering Br."); Dkt. 117, Pls.' Post-Trial Answering Br. ("Pls.' Answering Br.").  Computershare Trust filed memoranda with the court joining in the Williams Defendants' post-trial briefing.  *See* Dkt. 108, Def. Computershare Trust Company, N.A.'s Post-Trial Mem. or, Alternatively, Joinder in The Williams' Defs.' Opening Post-Trial Opening Br.; Dkt. 118, Def. Computershare Trust Company, N.A.'s Joinder in The Williams Defs.' Answering Post-Trial Br.

[192] 845 A.2d 1031, 1033 (Del. 2004).

*Tooley* involved a third-party, two-step acquisition in which the target corporation consented to the acquirer postponing the closing of the first-step tender offer by twenty-two days.[193] Stockholder plaintiffs sued, claiming that the stockholders of the target corporation had a contractual right to have the offer close on time. The plaintiffs claimed that had the offer closed on time, the stockholders would have gotten their money faster. As damages, the plaintiffs sought the time value of money that they had lost from the delay.[194]

The Court of Chancery held that the claims were derivative and dismissed them under Rule 23.1.[195] In reaching this conclusion, the trial court relied on Delaware decisions employing the concept of "special injury" to determine when a plaintiff could sue directly.[196] Those decisions defined special injury as a wrong "separate and distinct from that suffered by other shareholders . . . or a wrong involving a contractual right of a shareholder."[197]

Applying the special-injury test, the trial court held that there was no meaningful distinction between the contract rights of the tendering and non-tendering stockholders, such that they all held parallel contract rights.[198] The decision then reasoned that

---

[193] *Id.* at 1034.

[194] *Id.*

[195] *Id.* at 1033.

[196] *Id.* at 1035; *see Lipton v. News Int'l, Plc*, 514 A.2d 1075, 1079 (Del. 1986).

[197] *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del. Ch. 1985) ("*Moran I*"), *aff'd*, 500 A.2d 1346 (Del. 1985) (internal citations omitted).

[198] *Tooley*, 845 A.2d at 1035.

"[b]ecause this delay affected all . . . shareholders equally, plaintiffs' injury was not a special injury, and this action is, thus, a derivative action at most."[199] In other words, the trial court accepted the argument that it was appropriate to treat a claim—there, a contractual claim—as derivative if all of the stockholders held the same right and all suffered the same injury to their parallel right.

The Delaware Supreme Court reversed. The high court recognized that the concept of special injury had become "amorphous and confusing"[200] and traced much of the uncertainty to *Bokat v. Getty Oil Co.*, where it held that "[w]hen an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively in [sic] behalf of the corporation."[201] The *Tooley* court described *Bokat* as "confusing and inaccurate" for the following reasons:

> It is confusing because it appears to have been intended to address the fact that an injury to the corporation tends to diminish each share of stock equally because corporate assets or their value are diminished. In that sense, the *indirect* injury to the stockholders arising out of the harm to the corporation comes about solely by virtue of their stockholdings. It does not arise out of any independent or direct harm to the stockholders, individually. *That concept is also inaccurate because a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim.*[202]

---

[199] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 2003 WL 203060, at *4 (Del. Ch. Jan. 21, 2003).

[200] *Tooley*, 845 A.2d at 1035.

[201] 262 A.2d 246, 249 (Del. 1970), *abrogated by Tooley*, 845 A.2d at 1038–39.

[202] *Tooley*, 845 A.2d at 1037 (emphasis added).

In this passage, *Tooley* reframed the analysis in a way intended to remedy the confusion caused by *Bokat* by distinguishing between (i) an injury that fell *indirectly* on all stockholders equally, which supported a derivative claim, and (ii) an injury that affected stockholders *directly*, even if all stockholders suffered the same injury, which gave rise to a direct claim.[203] *Tooley* then expressly rejected the special-injury test in favor of a new, two-part standard, asking: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[204]

No decision since *Tooley* has addressed whether a claim seeking to enjoin a stockholder rights plan is derivative. In one decision, this court dismissed under Rule 23.1 a claim for damages challenging a defensive action, but the defensive action did not involve a rights plan and the plaintiff did not dispute that the claim was derivative.[205] In another decision considering a challenge to a series of anti-takeover measures, the court deemed the direct-derivative distinction immaterial to the outcome and thus declined to determine whether the claims were solely derivative.[206]

---

[203] *See generally In re El Paso Pipeline P'rs, L.P. Derivative Litig.*, 132 A.3d 67, 97–99 (Del. Ch. 2015) (describing *Tooley*'s treatment of the analysis in *Bokat*), *rev'd on other grounds sub nom, El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016).

[204] *Tooley*, 845 A.2d at 1033.

[205] *Ryan v. Armstrong*, 2017 WL 2062902, at *10, *18 (Del. Ch. May 15, 2017) (dismissing a concededly derivative stockholder challenge to a defensive measure where the plaintiff failed to plead that a majority of the board was interested in the transaction and instead relied on "*Unocal* to get around the demand requirement").

[206] *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *14–16 (Del. Ch. July 24, 2014) (denying motion to dismiss claims challenging, in part, a golden parachute award as an

*Tooley*, however, did not expressly overrule the cases applying the special-injury test, and the decision suggested that some of those cases might have reached the right outcome, thus opening the door for litigants to rely on decisions predating *Tooley*.[207] In briefing, Defendants rely on this court's pre-*Tooley* decision in *Moran* ("*Moran I*") for the proposition that poison pill challenges must be brought derivatively.

In *Moran I*, the board of Household International, Inc. ("Household") adopted a rights plan with 20% and 30% triggers as a preventive measure to fend off a potential takeover by an entity affiliated with one of Household's own directors.[208] Applying the special-injury test, the trial court concluded that the stockholder plaintiff's challenge was derivative:

> [W]here, as here, no shareholder is presently engaged in a proxy battle, and the alleged manipulation of corporate machinery does not directly prohibit proxy contests, such an action must be brought derivatively on behalf of the corporation."[209]

---

unreasonable anti-takeover device, concluding that "whether this claim is direct or derivative is immaterial" to the outcome on a motion to dismiss); *see also In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 81 (Del. Ch. 1999) (finding under the pre-*Tooley* special-injury test that a claim challenging a rights plan was direct in nature, but observing that claims "implicating the heightened scrutiny required by *Unocal*" will pass the demand futility test under *Aronson*); *In re Chrysler Corp. S'holders Litig.*, 1992 WL 181024, at *4 (Del. Ch. July 27, 1992) (concluding under the pre-*Tooley* special-injury test that the court "need not (and therefore does not) decide whether the plaintiffs' recission claims [challenging a rights plan] are solely derivative" because they satisfied the *Aronson* test).

[207] *See Tooley* 845 A.2d at 1039.

[208] *Moran I*, 490 A.2d at 1066.

[209] *Id.* at 1070.

Defendants interpret the above-quoted language as creating a rule that all poison pill challenges are derivative subject to a narrow exception that applies during an active proxy contest.[210] For simplicity, this decision refers to this characterization of *Moran I* as the "derivative presumption." Based on this presumption, Defendants argue that because Plaintiffs are not engaged in a proxy contest, they cannot pursue their claims directly.

As with any pre-*Tooley* holding, a court must determine whether the ruling resulted from the now-defunct special-injury test.[211] The derivative presumption of *Moran I* suffers from this flaw, as language found just two sentences after the above-quoted language reveals: "*Because the plaintiffs are not engaged in a proxy battle, they suffer no injury distinct from that suffered by other shareholders* as a result of this alleged restraint on the ability to gain control of Household through a proxy contest."[212] The emphasized language reflects that the *Moran I* court viewed the exception—a stockholder's active pursuit of a proxy battle—as a "separate and distinct" feature giving rise to a special injury. Absent that special injury, the *Moran I* court saw the pill as affecting the rights of all stockholders to the same degree. The derivative presumption of *Moran I* thus appears to be a direct application of the special-injury test, and this aspect of *Moran I* was thus impliedly abrogated by *Tooley*.

Even before *Tooley*, the derivative presumption of *Moran I* drew criticism. Just a few months after the Delaware Supreme Court issued *Moran II*, which affirmed *Moran I*

---

[210] Defs.' Opening Br. at 22.

[211] *See Tooley*, 845 A.2d at 1039.

[212] *Moran I*, 490 A.2d at 1070 (emphasis added).

41

without addressing the derivative question, a federal court rejected a pleading-stage argument that a claim challenging a poison pill adopted by the board of Crown Zellerbach Corporation was derivative in nature.[213]

In 1994, the American Law Institute's *Principles of Corporate Governance* highlighted the issue, commenting that "[c]ases have divided as to whether the issuance of a 'poison pill' security can be challenged by a direct action on the grounds that it chills voting rights or restricts the alienability of the shareholder's stock."[214] Foreshadowing the law's development in *Tooley*, the passage criticized *Moran I* because its "focus on the similarly of treatment misses the central point that fundamental shareholder rights (e.g., voting and alienability) can be infringed by a variety of board actions that treat existing shareholders alike."[215]

In 1999, this court in *Gaylord* criticized the derivative presumption in *Moran I*.[216] There, management owned a majority of the company's Class B, super-voting stock, which gave management control of the company.[217] A Chapter 11 restructuring required that the company reclassify its Class B stock and issue additional equity, which would reduce management's voting power from 74% to 20%.[218] Planning ahead, the management-

---

[213] *See Duman v. Crown Zellerbach Corp.*, 107 F.R.D. 761, 764–65 (E.D. Ill. 1985).

[214] 2 *Principles of Corporate Governance: Analysis and Recommendations* § 7.01 n.3, at 29 (Am. L. Inst. 1994).

[215] *See id.*

[216] *See Gaylord*, 747 A.2d at 76–79.

[217] *Id.* at 72–73.

[218] *Id.* at 73.

dominated board developed a strategy to maintain their control. First, the board adopted a poison pill with a 15% trigger that made it economically impractical for anyone to accumulate a meaningful block without the board's approval. Second, management exercised its power at both the board and stockholder levels to adopt a series of defensive charter and bylaw amendments before their voting control expired.[219] The stockholders challenged the defensive measures and the claims survived a motion to dismiss.[220]

On a motion for class certification, then-Vice Chancellor Strine was required to determine whether the complaint pled derivative or direct claims.[221] He criticized the reasoning of the rule of *Moran I* on multiple grounds, centering on *Moran I*'s failure to acknowledge who suffered the harm.[222] He pointedly asked "why a board's action to interpose itself between stockholders who are ordinarily free to sell their shares, and purchasers who are ordinarily free to buy those shares—if improper—works an injury *on the corporation as an entity*."[223] By contrast, he thought it was "obvious" that the plan infringed on stockholders' fundamental rights to sell and vote.[224] In the end, the Vice Chancellor followed the derivative presumption of *Moran I* but observed that the ruling

---

[219] *Id.*

[220] Then-Vice Chancellor Balick denied the motion, concluding that *Unocal* applied without analyzing whether the plaintiff's claims were direct or derivative in nature, reasoning that invocation of *Unocal* sufficed to defeat a motion to dismiss. *In re Gaylord Container Corp. S'holders Litig.*, 1996 WL 752356, at *2 (Del. Ch. Dec. 19, 1996).

[221] *See Gaylord*, 747 A.2d at 74–75.

[222] *See id.* at 76–79.

[223] *Id.* at 78 (emphasis added).

[224] *Id.*

was immaterial on the facts of the case.[225]  The Vice Chancellor explained that if the plaintiff stated a claim implicating *Unocal*, then the practical effect was "automatic demand excusal" under *Aronson*.[226]

*Tooley* addressed the faulty logic of *Moran I*'s derivative presumption.  It is now possible to embrace the reasoning of *Gaylord* and acknowledge that poison pills, if improper, work an injury on stockholders directly by interfering with at least two fundamental stockholder rights.

"Modern corporate law recognizes that stockholders have three fundamental, substantive rights:  to vote, to sell, and to sue."[227]  From these fundamental rights flow

---

[225] *Id.* at 82–83; *see Moran I*, 490 A.2d at 1069–71.

[226] *Gaylord*, 747 A.2d at 83; *id.* at 81 (observing that "[s]o long as the plaintiff states a claim implicating the heightened scrutiny required by *Unocal*, demand has been excused under" *Aronson*).  At the time, that statement accurately described of Delaware law.  The *Aronson* test announced in 1984 used "the standard of review for the challenged decision as a proxy for whether directors face a substantial likelihood of liability sufficient to render demand futile." *United Food and Commercial Workers Union v. Zuckerberg*, 2020 WL 6266162, at *15 (Del. Ch. Oct. 26, 2020).  For many years following *Aronson*, application of enhanced scrutiny or entire fairness had the collateral effect of satisfying the pleading-stage demand futility analysis. *Id.* at *9–11.  Delaware law subsequently evolved to imbue the derivative-direct distinction with greater practical import.  As Vice Chancellor Laster explained in his recent *Zuckerberg* decision, the standard of review no longer serves as a proxy for determining whether demand will be futile, and the hair-splitting direct-derivative distinction now has greater significance in the current jurisprudential landscape of Delaware law. *Id.* at *15–16; *see also Armstrong*, 2017 WL 2062902, at *13 (rejecting a *per se* rule that a well-pled *Unocal* claim is sufficient to survive a Rule 23.1 demand futility analysis).

[227] *Strougo v. Hollander*, 111 A.3d 590, 595 n.21 (Del. Ch. 2015); *see also EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012); *Unitrin*, 651 A.2d at 1379 (affirming stockholders' fundamental right to vote).

44

subsidiary rights, including the right to communicate with other stockholders,[228] nominate directors,[229] and communicate with (and even oppose) management and the Board.[230] As this court has observed, "[o]ne of the basic rights of a stockholder is to be able to communicate with his fellow stockholders on matters germane to such stock, and, if necessary, to organize other stockholders for corporate action."[231]

All rights plans interfere to a some degree with the right to sell and the right to vote, but *Moran* held that the level of interference is nominal in the traditional anti-takeover pill that has both a relatively high trigger and an exception for soliciting revocable proxies. A traditional pill did not attempt to restrict stockholder communications. As discussed below, the Plan goes beyond a traditional pill by combining a parsimonious trigger of 5% with the AIC Provision and a limited passive ownership exception. Through this combination of provisions, the Plan limits the act of communicating itself, whether with other stockholders or management. It also restricts the stockholder's ability to nominate directors. It thus infringes on the stockholders' ability to communicate freely in connection with the stockholder franchise, much of which occurs outside the context of proxy contests.[232] This articulation of the harm flows to stockholders and not the Company.[233] In this way,

---

[228] *B.F. Goodrich Co. v. Nw. Indus., Inc.*, 1969 WL 2932, at *2 (Del. Ch. Mar. 26, 1969).

[229] *Harrah's Ent., Inc. v. JCC Hldg. Co.*, 802 A.2d 294, 310–11 (Del. Ch. 2002).

[230] *Abajian v. Kennedy*, 1992 WL 8794, at *6 (Del. Ch. Jan. 17, 1992).

[231] *B.F. Goodrich,* 1969 WL 2932, at *2.

[232] Trial Tr. 189:13–190:14 (Mills).

[233] Defendants argue that Plaintiffs cannot show injury because Wolosky testified that he does not intend on running a proxy contest, replacing any director, acquiring more than 5% of Williams stock, engaging in a takeover transaction, or engaging with other stockholders,

enjoining the Plan is a remedy that affects stockholders alone and not the Company. Thus, Plaintiffs' claim is direct under *Tooley*.[234]

## B.    The Standard of Review

The parties also dispute the applicable standard of review. Plaintiffs contend that *Unocal* governs the court's analysis. Defendants argue that the more deferential business judgment standard applies.

Since the Delaware Supreme Court's decision in *Moran*, this court "and the Supreme Court have used *Unocal* exclusively as the lens through which the validity of a contested rights plan is analyzed."[235]

Defendants nevertheless argue that the Board's adoption and maintenance of the Plan should be subject to business judgment review. Defendants say that the sole

---

and he is not aware of any Williams stockholders who have refrained from taking this action because of the Rights Plan. *See* Defs.' Opening Br. at 21–22. They portray Wolosky's harm as entirely speculative. But it is not incumbent on a class representative to prove a negative. Given the Plan's features, the absence of stockholder activism could be a consequence of the Plan. And the fact that the Plan is alleged to have impeded the stockholder franchise suffices to render Plaintiffs' claims direct.

[234] At trial, Wolosky testified that the Plan impairs the value of the Company as a whole by stifling value-enhancing activities. Trial Tr. at 28:21–23 (Wolosky). Defendants seize on this testimony to argue that any damages would flow to the Company as a whole and not its stockholders directly. *See* Defs.' Opening Br. at 20 (quoting Trial Tr. at 28:11–23 (Wolosky)). Defendants' argument might have merit if Plaintiffs were pursuing a claim for damages, but Plaintiffs seek only injunctive relief. *See* Wolosky Compl., Prayer for Relief at 20–21. Because Plaintiffs are not seeking damages, this court need not resolve whether such a claim would be derivative in nature.

[235] *Third Point LLC v. Ruprecht*, 2014 WL 1922029, at *15 (Del. Ch. May 2, 2014); *see also eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 28 (Del. Ch. 2010) ("Enhanced scrutiny has been applied universally when stockholders challenge a board's use of a rights plan as a defensive device.").

justification for *Unocal's* enhanced standard is "the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders."[236] Defendants argue that this specter is not present where a poison pill is designed to address stockholder activism as opposed to hostile takeover attempts.

There are many possible responses to Defendants' attempt to parse finely the concept of entrenchment, but it suffices for present purposes to say that Defendants' contention runs contrary to the Delaware Supreme Court's decision in *Selectica II*.[237] There, the poison pill was adopted for the purpose of preserving NOL assets and not warding off hostile takeover attempts.[238] The court held that the *Unocal* standard nevertheless applied because all poisons pills, "by . . . nature," have a potentially entrenching "effect."[239] It is therefore settled law that the Board's compliance with their

---

[236] Defs.' Opening Br. at 27 (quoting *Unocal*, 493 A.2d at 954 (Del. 1985)); *see also Gaylord Container Corp. S'holders Litig.*, 753 A.2d 462, 474 (Del. Ch. 2000) (observing the "omnipresent specter" implicated "[w]hen a board adopts measures designed to deter or defend against an acquisition offer and thereby also against the possibility that the board and management will lose their positions after the acquisition").

[237] 5 A.3d 586.

[238] *Selectica II*, 5 A.3d at 599.

[239] *Id.* ("Any NOL poison pill's principal intent . . . is to prevent the inadvertent forfeiture of potentially valuable assets, not to protect against hostile takeover attempts. Even so, any Shareholder Rights Plan, by its nature, operates as an antitakeover device. Consequently, notwithstanding its primary purpose, a NOL poison pill must also be analyzed under *Unocal* because of its *effect* and its direct implications for hostile takeovers." (emphasis added)); *see also Third Point*, 2014 WL 1922029, at *15 & n.10 (applying *Unocal* to an anti-activist poison pill, observing that Delaware courts have "used *Unocal* exclusively as the lens through which the validity of a contested rights plan is analyzed" and that "[t]his includes cases in which a rights plan has been used outside of the hostile takeover context"); *Air Prods. and Chems. v. Airgas, Inc.*, 16 A.3d 48, 94 (Del. Ch. 2011) (observing that "[t]he *Unocal* standard of enhanced judicial scrutiny—not the business judgment rule—is the standard of review that applies to a board's defensive

47

fiduciary duties in adopting and then failing to redeem the Plan must be assessed under

*Unocal*.[240]

## C.  The *Unocal* Analysis

Having addressed the two threshold issues, this decision now turns to the merits of

the enhanced scrutiny analysis.  *Unocal* calls for a two-part inquiry.  "The first part of

*Unocal* review requires a board to show that it had reasonable grounds for concluding that

a threat to the corporate enterprise existed."[241]  Framed more broadly, directors must

demonstrate that they acted in good faith to achieve a "legitimate corporate objective."[242]

---

actions taken in response to a hostile takeover," and that "[t]his is how Delaware has always interpreted the *Unocal* standard"); *eBay*, 16 A.3d at 28 (observing that "[e]nhanced scrutiny has been applied universally when stockholders challenge a board's use of a rights plan as a defensive device"); *Yucaipa Am. Alliance Fund II, L.P. v. Riggio*, 1 A.3d 310, 330–36 (Del. Ch. 2010) (applying *Unocal* to an anti-activist poison pill).

[240] Defendants attempt to meet *Selectica* with an overly narrow concept of entrenchment. "Entrench" means to fortify a position—to make change difficult or unlikely.  *See, e.g., Entrench*, Merriam Webster, https://www.merriam-webster.com/dictionary/entrench (defining "entrench' as "to place within or surround with a trench especially for defense," "to place (oneself) in a strong defensive position," and "to establish solidly"); *Entrench*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/entrench (defining "entrench" as "to firmly establish something . . . so that it cannot be changed"); *Entrench*, Lexico, https://www.lexico.com/en/definition/entrench (defining "entrench" as to "[e]stablish (a person or their authority) in a position of great strength or security," noting that the word originates from "the sense 'place within a trench'").  As discussed below, the Board in this case acted with the purpose of insulating the Board and management from stockholder influence during a time of uncertainty.  This conduct thus seems to fit the definition of entrenchment.

[241] *Selectica II*, 5 A.3d at 599.

[242] *See Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 807–810 (Del. Ch. 2007) (cautioning against placing "too much emphasis on the word 'threat'" when conducting a *Unocal* review); *id.* (stating that "[t]he core of *Unocal*'s utility really rests in the burden it asserts on directors to:  (1) identify the proper corporate objectives served by their actions; and (2) justify their actions as reasonable in relationship to those objectives").

To satisfy the first part of *Unocal*, Defendants must demonstrate that the Board conducted a "good faith and reasonable investigation."[243] The reasonableness of the investigation is "materially enhanced"[244] where the corporate decision is approved by a board comprising a majority of outside, nonemployee directors "coupled with a showing of reliance on advice by legal and financial advisors."[245]

To meet their burden under the first part of *Unocal*, however, Defendants must do more than show good faith and reasonable investigation. "[T]he first part of *Unocal* review requires more than that; it requires the board to show that its good faith and reasonable investigation *ultimately gave the board 'grounds for concluding that a threat to the corporate enterprise existed.'*"[246] In other words, after conducting a reasonable investigation and acting in good faith, the board must show that it sought to serve a legitimate corporate objective by responding to a legitimate threat. If the threat is not legitimate, then a reasonable investigation into the illegitimate threat, or a good faith belief that the threat warranted a response, will not be enough to save the board.

The second part of *Unocal* requires a board to show that the defensive measures were "reasonable in relation to the threat posed."[247] This element of the *Unocal* test

---

[243] *Unocal*, 493 A.2d at 955.

[244] *Id.*

[245] *Selectica, Inc. v. Versata Enters., Inc.*, 2010 WL 703062, at *12 (Del. Ch. Feb. 26, 2010) ("*Selectica I*").

[246] *Air Prods.*, 16 A.3d at 104 (quoting *Selectica II*, 5 A.3d at 599) (emphasis added).

[247] 493 A.2d at 949. By adopting the nomenclature of *Unocal*, this court does not place "too much emphasis on the word 'threat.'" *Mercier*, 929 A.2d at 807.

49

recognizes that a board's powers to act "are not absolute" and that a board "does not have unbridled discretion to defeat any perceived threat by any Draconian means available."[248] When applying the reasonableness standard, the court does not substitute its judgment for that of the board. The court instead determines whether the measure falls within "the range of reasonableness."[249]

When conducting the proportionality analysis, the court also examines the relationship between the defensive action that the directors took and the problem they sought to address.[250] The court thus examines "the reasonableness of the end that the directors chose to pursue, the path that they took to get there, and the fit between the means and the end."[251] It is the specific nature of the threat that "sets the parameters for the range

---

[248] 493 A.2d at 949.

[249] *Unitrin*, 651 A.2d at 1387–88 (quoting *Paramount*, 637 A.2d at 45–46).

[250] *See Mercier*, 929 A.2d at 808.

[251] *See Obeid v. Hogan*, 2016 WL 3356851, at *13 (Del. Ch. June 10, 2016) (providing overview of enhanced scrutiny); *Mercier,* 929 A.2d at 810–811 (explaining that when directors take action that affects stockholder voting, enhanced scrutiny requires that the defendant fiduciaries bear the burden of proving (i) that "their motivations were proper and not selfish," (ii) that they "did not preclude the stockholders from exercising their right to vote or coerce them into voting a particular way," and (iii) that the directors' actions "were reasonable in relation to their legitimate objective"); *id.* at 811 ("If for some reason, the fit between means and ends is not reasonable, the directors would also come up short."); *see also In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch.2010) (explaining that when applying enhanced scrutiny, "the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated decisions"); *id. at 599–600* ("[T]he reasonableness standard requires the court to consider for itself whether the board is truly well motivated (i.e., is it acting for the proper ends?) before ultimately determining whether its means were themselves a reasonable way of advancing those ends."); *cf. Yucaipa*, 1 A.3d at 337 ("*Unitrin* left room

of permissible defensive tactics" and a "reasonableness analysis requires an evaluation of the importance of the corporate objective threatened; alternative methods for protecting that objective; impacts of the defensive action and other relevant factors."[252]

### 1. The Director Defendants' Reasons for Acting

The Director Defendants' actual and articulated reason for taking action figures prominently in the *Unocal* analysis. In the traditional language of *Unocal*, the directors must have identified and responded to a legitimate corporate threat. They cannot justify their conduct based on threats that they never identified or beliefs they did not hold.[253] Before turning to the question of whether the threat is legitimate, the court must determine why the Director Defendants acted. This decision therefore starts by making factual findings concerning the threat or corporate objective to which the Board was responding when adopting the Plan.

### a. The Actual Threats That the Board Identified

It is often difficult to distill a unified purpose behind a decision made by a group of people; often, members of the group have different reasons for supporting a decision. It is particularly difficult to discern such a purpose in the context of litigation, where there is

---

for a determination that a non-preclusive, non-coercive defensive measure was nonetheless unreasonable in light of the threat faced by the corporation.").

[252] *Selectica I*, 2010 WL 703062, at *19 (internal quotation marks omitted) (first quoting *Unitrin*, 651 A.2d at 1384, and then quoting *Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1154 (Del. 1989)) (internal quotation marks omitted).

[253] *See, e.g.*, *Chesapeake Corp. v. Shore*, 771 A.2d 293, 332 (Del. Ch. 2000) (finding that board did not identify and consider a threat it later relied on at trial).

always the risk that fact witnesses will recall events that occurred prior to litigation through the lens of newly crafted litigation positions.

This challenging task is further complicated here because the lawyer-drafted documents to which one would typically look for a statement of a board's purpose—e.g., board resolutions, board minutes, company disclosures—do not reflect the Board's actual intent. The materials from the March 19 Board meeting, including the resolution, the March 20 Press Release, and the March 30 Proxy Supplement, all state that the Plan was intended in part to serve as a takeover deterrent.[254] But the Plan was not designed for that

---

[254] JX-67 at 2 (March 19 Board meeting minutes) ("The Board deems it desirable and in the best interests of the Company and its stockholders that *steps be taken to preserve for the Company's stockholders the long-term value of the Company* in the case of *a coercive or inadequate takeover* or *rapid accumulations of large positions by persons not having a passive intent*." (emphasis added)); JX-69 at 2 (March 20 Williams press release) ("The Board . . . has adopted the [Plan] to reduce the likelihood that a *potential acquirer would gain (or seek to influence or change) control of the Company by open market accumulation or other tactics without paying an appropriate premium for the Company's shares*. (emphasis added)); JX-82 at 3 (March 30 Proxy Supplement) ("The Board determined that the adoption of the [Plan] is appropriate in light of the extreme market dislocation that has resulted in the company's stock being fundamentally undervalued. The conditions stemming from the impact of COVID-19 on the economy and the volatility of the oil market have resulted in significant decline in the company's stock price. *The [Plan] is intended* to enable all Williams stockholders to realize the full value of their equity investment and *to reduce the likelihood* of those seeking short-term gains taking advantage of current market conditions at the expense of the long-term interests of stockholders or *of any person or group gaining control of Williams through open market accumulation or other tactics* (especially in volatile markets) without paying an appropriate control premium." (emphasis added)); *id.* ("The company has, as of the date of this supplement, reached out to all of our major stockholders regarding our rights plan. Most of the stockholders we have engaged with to date have informed us that they understand the need for the adoption of our [Plan] in the context of the highly unusual and extreme circumstances that led to the current severe market conditions and the need to protect the interests of the company and its long-term stockholders." (emphasis added)).

52

purpose, and some of the directors did not have that in mind when adopting the Plan.[255]

The Plan was not adopted with the objective of deterring takeover attempts.

In fact, the Plan was not adopted to protect against any *specific* threat at all.[256] The

[255] *See* Trial Tr. at 93:16–19 (Cogut) (confirming that "the pill wasn't intended or designed to deal with the risk of a takeover at all"); *id.* at 515:1–7 (Subramanian) (opining that "this rights plan was not meant to be a hostile takeover deterrent" and that "the pill would have been virtually irrelevant for that kind of hostile bid" because the company was vulnerable to takeover activity for other reasons). Other witnesses were more qualified in their statements, testifying that the Plan was not intended to deal with a *specific* takeover threat. *See, e.g.*, *id.* at 599:7–10 (Buese) (confirming that "the pill was not adopted in response to any person or group attempting to take control of the company"); Bergstrom Dep. Tr. at 179:23–180:16 (testifying that he was "not aware of any specific takeover threat at the time"). *But see* Fuller Dep. Tr. at 56:8–20 (testifying that "we were doing something to protect the long-term shareholders and prevent someone coming in and, you know, sort of acquiring stock at very low levels and possibly . . . *forcing a sale of the company* below its long-term value" (emphasis added)).

[256] PTO ¶ 82; Trial Tr. at 544:8–15 (Buese) (testifying that "there was no actual threat"); Bergstrom Dep. Tr. at 181:13–19 (testifying that "we were not aware of any specific threat, as I earlier testified"); Fuller Dep. Tr. at 234:22–235:5 (testifying that she perceived no "current threat" to Williams when the Plan was adopted); *see also* JX-78 at 11 (Chandler telling investors during a Mar. 25, 2020 business update call: "we did not adopt that [rights] plan . . . in response to any specific threat"); JX-187 at 12 (Krieg emailing Wilson and Chandler on Apr. 13, 2020, with points for Apr. 15, 2020 investor relationship call, stating that the "[p]lan was not adopted in response to any known / specific threat"); JX-62 at 1 (Chandler writing in a Mar. 19, 2020 email: "I do think it is important to leave the reader with the belief this [adoption of the Plan] is not being done because of some ominous business results that will be coming out . . . . But purely because we don't think the market price is reflective of our value." (ellipses in original)); *id.* at 2 (Chandler writing in a Mar. 18, 2020 email: "We will want to alleviate fears that we are doing this because something ominous is coming."); *id.* (Krieg writing in a Mar. 18, 2020 email that "the strong position of our business is not being recognized by the market; we don't want opportunist [sic] to swoop in and claim the true value of the business at an artificially low value"); Trial Tr. at 92:5–10 (Cogut) ("I think it's an open question as to whether or not there needed to be a threat for us to have taken this action."); *id.* at 353:6–354:2 (Smith) (testifying that he was not aware of any activists, or persons generally, seeking to take advantage of Williams stock price at the time the Plan was adopted).

Board was not concerned about any specific activist threat.[257] Nor was the Board acting to preserve any specific asset like an NOL.[258] Instead, the Board was acting pre-emptively to interdict hypothetical future threats.[259]

The Plan was also not adopted in light of the Company's prior experience with activism, although Defendants took that position throughout this litigation.[260] It is true that

---

[257] *See* Trial Tr. at 321:8–10 (Smith) (testifying that he was not aware of "any particular risks with respect to shareholder activism"); *id.* at 93:20–94:7 (Cogut) ("There was, to the best of our knowledge at that point, very little activist involvement, but there was . . . a market opportunity for people who might want to come in and exercise influence and control over the company. . . ."); *id.* at 599:11–14 (Buese) (confirming that the Plan "was not adopted in response to any person or group attempting to exercise influence over the company"); Bergstrom Dep. Tr. at 182:5–9 (testifying that "[t]here was not any specific activist investor threat"); Fuller Dep. Tr. at 196:3–13 (testifying that the "danger" was that "someone could amass a fair amount of stock and put itself in a position of forcing the board to take action that was not in the best interest of the long-term shareholders").

[258] Trial Tr. at 598:23–599:2 (Buese); *id.* at 346:19–22 (Smith); Chandler Dep. Tr. at 195:17–21.

[259] *See* JX-73 at 1 (Wilson emailing management on Mar. 20, 2020: "I think I can help convince [Blackrock] that this was *solely a proactive effort, that we monitor our positions frequently and that we have no indication of anyone being in our stock*. We can also be very definitive that we have not received an offer. I also think its fair game to point out that the company has been through this once before recently and saw how an *activist can destroy long term value* – again purely proactive." (emphasis added)); *id.* at 2 (Wilson emailing management on Mar. 20, 2020: "I think we can craft a very good argument that this should be viewed by our long term investors as good governance. . . . Activists always push the needle in the wrong direction on those issues, so we are being **proactive to prevent an activist** from making a lot of short term money at the cost of the very things Blackrock views as most important." (emphasis added)).

[260] JX-144 at Response to Interrogatory No. 1 ("The Board's views and conclusions were also reinforced by Williams' experience during the 2013 to 2016 time period with two shareholder activists, each of whom held less than 5% of Williams stock but who acted together in a coordinated attempt to exert substantial influence over Williams."); Subramanian Report ¶ 16 ("I understand from my review of deposition testimony taken in this action that one of the factors that motivated the Board's adoption of a poison pill in

54

Williams management cited prior activism as a justification for the Plan when communicating with stockholders in advance of the annual meeting.[261] It is also true that Smith's prior experience appears to have contributed to his support of the Plan.[262] But there is no evidence that it was a motivating factor of the Board as a whole. The Board simply did not discuss the Company's prior experience with activism during the March 18 or March 19 meetings.[263] This justification appears to have emerged at the Board level after the Plan had been adopted.[264] Indeed, Cogut testified that "the fact that the company

---

March 2020 was Williams' past experience with shareholder activists several years earlier.").

[261] *See, e.g.,* JX-117 at 7 (communicating to stockholders that "Company experience in recent past reinforced Board's view that 5% is the right threshold in this environment"); JX-70 at 1 (strategizing a response to Blackrock's concerns, Wilson noting that "it's fair game to point out that the company has been through this once before recently and saw how an activist can destroy long term value"); JX-187 at 3 (noting, in a document containing talking points for conversations with investors, that Company representatives should discuss: "Company recent past experiences with activism – Corvex and Sorobon [sic] owned, either as beneficial owners or as economic interest owners, 9.96% of the Company's outstanding shares. Neither owned more than 5%.").

[262] *See* JX-46 (Smith emailing Wilson on the evening of March 17 that he was "[v]ery happy about the upcoming discussion on a shareholders rights plan especially after recounting to [Cogut] what we went thru [sic] in 2015/16"); *see also* Trial Tr. at 322:9–323:12 (Smith) (testifying that his email referred to the activism Williams had previously faced, but that he had not discussed that experience "at this particular time"); *id.* at 351:23–352:24 (Smith).

[263] Trial Tr. at 334:1–10 (Smith); *id.* at 548:23–549:3 (Buese); *id.* at 143:21–144:4 (Cogut).

[264] For example, Cogut's first mention of the prior activism appears in an April 9, 2020 email exchange with Wilson where Wilson suggested adding to the "talking points" to be discussed with stockholders that "Corvex and Sorobon [sic] owned, either as beneficial owners or as economic interest owners, 9.96% of our outstanding shares. We'll have that in the talking points or facts. It goes to the very reason we did 5%." JX-104. *But see* Trial Tr. at 169:5–12 (Cogut) (testifying that the 5% trigger "was there for a number of reasons, but not because the Corvex and other guys had 9.6"). And testimony by the Director Defendants unequivocally confirms that the subject was never discussed by the Board in

had to deal with activists before was not a motivating force"[265] and that he "would have had the same idea whether or not the company had ever had activist experience."[266]

The record is clear that the Company's declining stock price was the initial catalyst for the Board's decision. Testimony and contemporaneous emails align on this fact.[267] The context and timing of the Plan's adoption further corroborates it, as the Board called an "urgent" meeting as its stock price continued to decline in the wake of the market disruption caused by COVID-19 and the oil pricing war.[268]

When asked during trial and at their respective depositions about the reasons for adopting the Plan, Cogut, Smith, Buese, Bergstrom, and Fuller testified generally that the

connection with its pill deliberations. *Id.* at 143:21–144:4 (Cogut); *id.* at 334:1–19; 352:15–353:5 (Smith); *id.* at 548:23–549:15, 577:23–579:11 (Buese).

[265] Trial Tr. at 143:21–24 (Cogut).

[266] *Id.* at 144:2–4 (Cogut).

[267] *See* JX-50; JX-62; JX-171; Trial Tr. at 320:1–24 (Smith); *id.* at 551:7–10, 554:18–555:3 (Buese); Bergstrom Dep. Tr. at 182:5–14; *see also* Trial Tr. at 147:20–148:5 (Cogut) ("And, obviously, other than being concerned that there would be market dislocation because of COVID, you know, I had no expectation that, you know, over the course of the next two to three weeks that the stock would fall the way it did.").

[268] *See* JX-45 at 1 (proposing "an urgent special telephonic board meeting to discuss the possibility of a shareholder rights plan"); PTO ¶ 83 ("The conditions that caused the significant decline in Williams stock price stemmed from the impact of COVID-19 on the economy and the volatility of the oil market relating to the pricing war . . . ."); PTO Ex. A (noting Williams' declining stock price during March 2020). In briefing, Plaintiffs made much of the fact that Cogut testified that he "wasn't really concerned that the [stock] price was low," *see* Pls.' Opening Br. at 20, but Cogut made this statement almost immediately after affirming his concern that "the stock price would create a certain amount of opportunism and availability" for activism to emerge. Trial Tr. at 143:9–20 (Cogut). Cogut's testimony, therefore, does not undermine the weight of evidence reflecting that the market-wide dislocation was the impetus behind the Plan.

intent of the Plan was to deter stockholder activism, although they all added their own gloss when articulating this purpose.

Cogut's testimony was the most unadorned and refreshingly candid. He testified that he proposed the Plan to insulate the Board and management from all forms of stockholder activism during the uncertainty of the pandemic. In Cogut's words:

- The Rights Plan was a "novel concept" that used "the technology of shareholder rights plans to *provide insulation [for] management during the uncertainty created by the pandemic*."[269]

- The Plan's objective was agnostic regarding different kinds of activism. When asked whether Cogut was "drawing distinctions between different kinds of activism" the Plan was trying to halt, he responded: "*Any activism that would influence control over the company* at an aggregate level above 5 percent, yeah."[270]

- The Plan's value was its ability "to prevent against an activist buying a toehold of 5 percent or more or acting in concert with other activists *so that our management could be freed up ... to run a company during COVID*."[271]

- The Plan's power was immense: "[T]he shareholder rights plan is the *nuclear weapon of corporate governance*," and "nuclear weapons are deterrents" that would force activists to deal with the Board instead of talking to each other.[272]

- The Plan's objective was to impose a "*one-year moratorium*" on activism.[273]

---

[269] Trial Tr. at 69:8–11 (Cogut) (emphasis added); *see also id.* 69:22–70:1 (Cogut) (confirming his view that the purpose of the pill was to "protect against activists during COVID"); JX-41 (Cogut writing in a March 17, 2020 email that "[t]he goal is to prevent a raider from taking advantage of the current situation").

[270] Trial Tr. at 70:20–71:5 (Cogut) (emphasis added).

[271] *Id.* at 114:24–125:13 (Cogut) (emphasis added).

[272] *Id.* at 114:10–20 (Cogut) (emphasis added).

[273] *Id.* at 118:11–18 (Cogut) (emphasis added).

57

Smith similarly testified that he hoped to protect the company from outside pressures to allow the Board and management to "get our job done."[274] Smith expressed a desire to protect long-term interests. Smith also expressed a desire to force stockholders seeking to accumulate stock in excess of 5% to negotiate with the Board. In Smith's words:

- He described the rights plan as "one more arrow in the quiver" to "***protect the company from more outside pressures*** so we can get our job done."[275]

- His concern was: "[H]ow do we ***protect our long-term shareholders***? And how do we protect this company?"[276]

- He was not focused on "any particular risks with respect to shareholder activism," but he instead sought to "creat[e] a pathway that would allow us to move forward."[277]

- He viewed the Plan as a form of buffer—"***guardrails along the track*** so that we could have a map to be able to rationally deal with any type of event that might occur under a shareholder rights plan."[278]

Buese too was concerned about stockholder activism, but she focused more specifically on "short-term-oriented investors."[279] She also expressed concerns about the "rapid accumulation by shareholders."[280] In Buese's words:

- "[I]n the energy space, and the MLP sector in particular, ***there were a number of well-known short-termist parties*** and hedge funds who were

---

[274] *Id.* at 320:19–20 (Smith).

[275] *Id.* at 320:15–321:5 (Smith) (emphasis added).

[276] *Id.* at 320:21–24 (Smith) (emphasis added).

[277] *Id.* at 321:8–10 (Smith); *see also* JX-46 (Smith writing in a March 17, 2020 email that he was "[v]ery happy about the upcoming discussion on a shareholders rights plan especially after recounting to [Cogut] what we went thru [sic] in 2015/16").

[278] Trial Tr. at 354:19–23 (Smith) (emphasis added).

[279] *Id.* at 539:22 (Buese).

[280] *Id.* at 601:16–17 (Buese).

known to work together in certain circumstances and had done so in the past."[281]

- The volatility in Williams stock price "was creating a lot of uncertainty and *risk for the long-term value of the company* that was completely unwarranted and not borne out by the performance of the company."[282]

- "*[S]hort-term-oriented investors not infrequently will take the opportunity to build up, accumulate shares, and may act in a way or attempt to act in a way that is not consistent with the long-term*, best interests of the overall shareholder group."[283]

- "*[T]he rapid accumulation and the very low share price, even in just raw dollars, would potentially invite short-termism and hedge funds to jump in.*"[284]

- "*[Y]ou see the short-termism come out of the woodwork*" where "*the market was reacting to the macro conditions with a great deal of velocity.*"[285]

- The Board discussed the threat of a rapid accumulation of stock at the March 19 meeting and Morgan Stanley advised that the Plan "*would deter an activist from taking advantage of the current market dislocation* and challenges in monitoring unusual trading patterns that results in a rapid accumulation of a >5% stake."[286]

- "[P]art of the fiduciary duty of the board members is that . . . if an offer is provided to the board and/or to management, that it's our job to consider it and give it due course. The entire purpose of the [P]lan is to *make sure that that was not done in a way that is only for the interests of the short-term investor taking that action and not in the overall best interests of the entire shareholder group for the longer term*."[287]

---

[281] *Id.* at 548:12–16 (Buese) (emphasis added).

[282] *Id.* at 539:5–18 (Buese) (emphasis added).

[283] *Id.* at 539:21–540:2 (Buese) (emphasis added).

[284] *Id.* at 556:23–557:6 (Buese) (emphasis added).

[285] *Id.* at 539:5–13 (Buese) (emphasis added).

[286] *Id.* at 556:7–23 (Buese) (emphasis added).

[287] *Id.* at 566:9–21 (Buese) (emphasis added).

- But the Board was not aware of a "rapid accumulation of Williams stock by any particular investor" at the time the Plan: "*[T]here was no actual threat. . . . [I]t was a perceived threat . . . .*"[288]

Bergstrom testified that the Plan specifically targeted activists. He echoed the "guardrails" and "rapid accumulation" concerns raised by Smith and Buese. In Bergstrom's words:

- The Plan was "being used to avoid raiders – *activists getting involved at the company* because the stock had dropped from $24 to eight and made it much, much easier for somebody to come in who wanted to disrupt the company at that point in time. And that was the . . . concern that I had."[289]

- *Activist activity was the "big concern from my perspective*. I'm not sure how widely -- how wide that was a concern of the rest of the board. That was clearly mine."[290]

- The Plan "*allows the company to -- the board to negotiate and talk to the shareholder* who jumps in the middle and wants to do something different dramatically or different than what the company currently is doing."[291]

- When the Plan was adopted, "[t]here was not any specific activist investor threat," but "the result in stock price decline certainly made it much, much easier for that to occur."[292]

- He further explained that "we thought if we did nothing, that the company was at risk for activist investors to do things that were not in the best interest of the total shareholder base. . . . Plus, at that point, you know, the stock price, our cash flow had not changed materially and the stock price had dropped . . . by threefold. And the price was not representative of the value

---

[288] *Id.* at 544:8–15 (Buese) (emphasis added).

[289] Bergstrom Dep. Tr. at 52:19–53:2 (emphasis added).

[290] *Id.* at 50:11–14 (emphasis added).

[291] *Id.* at 31:9–25 (emphasis added).

[292] *Id.* at 182:5–9.

of the cash flows going forward. And so we felt like as a board we needed to do something . . . to protect it."[293]

Fuller testified that the Plan was intended to avoid disruption by insulating the management team to allow them to focus on long-term interests. She too testified as to her desire to protect the Company against short-termism and the rapid accumulation of stock. In Fuller's words:

- "The company is dealing with a whole host of very significant and serious, serious issues at this time. And what's being discussed is something to put in place for the short-term to at least make sure that a group of activists don't just take a position without having to declare themselves and their intention. . . . And *I really wanted this excellent management team to at least be focused on making sure that we weren't vulnerable.*"[294]

- "What was foremost in my mind was making sure that we got the best value for shareholders. And that . . . *the management team was focused on making sure the company navigated and that shareholders, long-term shareholders* . . . would not be in a position where there was a sale that was way below what the company was truly worth."[295]

- The "danger" posed was that the stock "was so underpriced that someone could *amass a fair amount of stock* and put itself in a position of forcing the board to take action that was *not in the best interest of the long-term shareholders*."[296]

- When asked about threats to corporate policy and effectiveness, she responded that she was "aware of . . . what had happened in a generic sense in 2013. And that it had been pretty really disruptive to the management of the company. *And thinking about disruption, we are already in a disruptive environment, hugely disruptive, was something that I was concerned would have a negative effect on the operations of the company*."[297]

---

[293] *Id.* at 184:10–185:7.

[294] Fuller Dep. Tr. at 233:3–234:19 (emphasis added).

[295] *Id.* at 57:25–58:13 (emphasis added).

[296] *Id.* at 196:3–13 (emphasis added).

[297] *Id.* at 225:16–25 (emphasis added).

61

A few themes emerge from the Director Defendants' testimony. First, they all expressed the sentiment that the Plan was intended to deter stockholder activism.[298] Second, they desired to insulate the board from activists pursuing "short-term" agendas and from distraction and disruption generally. Third, they were concerned that a stockholder might stealthily and rapidly accumulate large amounts of stock.[299]

### b. The Legitimacy of the Actual Threats

The first prong of *Unocal* requires evaluating whether the Board has demonstrated that it conducted a good faith reasonable investigation and had "grounds for concluding that a threat to the corporate enterprise existed."[300] Defendants have demonstrated that the Board conducted a good faith, reasonable investigation when adopting the Plan. The Director Defendants are nearly all independent, outside directors. They considered the Plan over the course of two meetings. Although aspects of the record create the impression that the second Board meeting was window dressing, it is clear that there was genuine

---

[298] *See also* JX-187 at 1 (Chandler writing: "limited scope → just activist").

[299] This last purpose features prominently in the documentary record as well. *See* JX-171 at 2 (Krieg writing: "One thing we are interested in is folks who may be getting close to the 5% ownership line in real-time (so surveillance data). Could you all produce a report that shows folks where [sic] are close to crossing the 5% ownership line or folks who look like they might be ramping up their position (close to that line)?"); JX-172 at 3 (Krieg writing: "[C]ould you all take a look at the surveillance data with a view to who might be working their position upward, towards a 5% ownership position?"); JX-65 at 4 (Morgan Stanley March 19 Board presentation stating that "[t]he rights plan would deter an activist from taking advantage of the current market dislocation and challenges in monitoring unusual trading patterns that results in a rapid accumulation of a >5% stake"); JX-117 at 5 (April 15 disclosure stating that the goal was "[t]o prevent an opportunistic party from achieving substantial influence or control without paying a control premium to other stockholders").

[300] *Air Prods.*, 16 A.3d at 104 (quoting *Selectica II*, 5 A.3d at 599).

deliberation concerning the Plan. Defendants were advised by outside legal and financial advisors who were available to answer questions. Certainly, aspects of the process were less than perfect.[301] Still, nothing about the process jumps out as unreasonable.[302]

The real problem is not the process that Defendants followed, but the threats they identified. The first threat was quite general—the desire to prevent stockholder activism during a time of market uncertainty and a low stock price. The second threat was only slightly more specific—the concern that activists might pursue "short-term" agendas or distract management. The third threat was just a hair more particularized—the concern that activists might rapidly accumulate over 5% of the stock and the possibility that the Plan could serve as an early detection device to plug the gaps in the federal disclosure regime.[303] Each of the three threats were purely hypothetical; the Board was not aware of

---

[301] *See generally* Pls.' Answering Br. at 23–26.

[302] *See Gaylord*, 753 A.2d at 478–79 (finding a good faith, reasonable investigation under similar circumstances); *Moran II*, 500 A.2d at 1356 (finding a good faith reasonable investigation where the board received information from advisors, was informed as to "the essentials of the [p]lan," and had a "three-page summary" of the plan). To be sure, it would have been better if the Director Defendants read the Plan or at least had a more meaningful discussion of its features before adopting it. But these defects are not fatal. It is generally true that a director does not need to read every work of a dense legal document to demonstrate that the investigation was reasonable. *See Moran I*, 490 A.2d at 1068, 1083 (upholding rights plan even though "some directors were not conversant with the implications of the plan"); *Yucaipa*, 1 A.3d at 343, 361 (upholding plan even though "some directors admittedly had difficulty interpreting" it and observing that such difficulty was "understandable because it [was] a complex agreement"). "Delaware law does not require that a senior decision-maker . . . read every agreement *in haec verba*." *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *15 (Del. Ch. May 16, 2012), *aff'd*, 68 A.3d 665 (Del. 2013).

[303] *See* Subramanian Report ¶¶ 79–81.

any specific activist plays afoot. The question presented is whether these hypothetical threats present legitimate corporate objectives under Delaware law.

### i. Stockholder Activism

"Stockholder activism" is a broad concept that refers to a range of stockholder activities intended to change or influence a corporation's direction.[304] Activists may pressure a corporation to make management changes, implement operational improvements, or pursue a sale transaction. They may seek to catalyze or halt a merger or acquisition. More recently, "ESG activism" has come to the fore, and stockholders have begun pressuring corporations to adopt or modify policies to accomplish environmental, social, and governance goals.[305] Many forms of stockholder activism can be beneficial to a corporation, as Defendants themselves recognize.[306]

Under Delaware law, the board of directors manages the business and affairs of the corporation.[307] Thus, stockholder activism is directed to the board. And activists' ability

---

[304] Mills Report ¶ 31; *accord.* Goldfarb Report ¶ 16 ("An activist investor is a shareholder that seeks to induce management and the board of directors to make changes at a company.").

[305] *See* Mills Report ¶ 31; *see also* Omari Scott Simmons, *Chancery's Greatest Decision: Historical Insights on Civil Rights and the Future of Shareholder Activism*, 76 Wash. & Lee L. Rev. 1259, 1289–90 (2019) (referring to ESG activism as "[t]he new wave of corporate social activism" involving "the public-private spheres, evolution of corporate social responsibility efforts, and expansion of corporate political rights"). Former-Chief Justice Strine has also suggested that the "E" in "ESG" refers to employee-related action. *See* Leo E. Strine, Jr. *Toward Fair and Sustainable Capitalism* 6 (U. Pa. Inst. For L. & Econ. Res., Paper No. 19-39, 2019) (reframing ESG as "EESG," noting "the vital missing 'E'—the interests of companies' employees").

[306] *See* Trial Tr. at 73:7–10 (Cogut); *id*. at 536:2–16, 581:17–23 (Buese).

[307] 8 *Del. C.* § 141(a).

to replace directors through the stockholder franchise is the reason why boards listen to activists. Most activists hold far less than a hard majority of a corporation's stock, making the main lever at an activist's disposal a proxy fight. In this way, stockholder activism is intertwined with the stockholder franchise.

Under Delaware law, directors cannot justify their actions by arguing that "without their intervention, the stockholders would vote erroneously out of ignorance or mistaken belief" in an uncoerced, fully informed election.[308] "The notion that directors know better than the stockholders about who should be on the board is no justification at all."[309]

Viewing all stockholder activism as a threat is an extreme manifestation of the proscribed we-know-better justification for interfering with the franchise. That is, categorically concluding that *all* stockholder efforts to change or influence corporate direction constitute a threat to the corporation runs directly contrary to the ideological underpinnings of Delaware law. The broad category of conduct referred to as stockholder activism, therefore, cannot constitute a cognizable threat under the first prong of *Unocal*.

To be sure, Delaware law does not categorically foreclose the possibility that certain conduct by activist stockholders might give rise to a cognizable threat. Defendants cite to four cases where a Delaware court upheld defensive actions taken in response to types of stockholder activism.[310] All involved different scenarios and more specific threats.

---

[308] *Pell v. Kill*, 135 A.3d 764, 788 (Del. Ch. 2016).

[309] *Mercier*, 929 A.2d at 811.

[310] *See* Defs.' Opening Br. at 32–36 (citing *Third Point*, 2014 WL 1922029, at *21–22; *Yucaipa*, 1 A.3d at 343; *Polk v. Good*, 507 A.2d 531, 537 (Del. 1986); *Cheff v. Mathes*, 199 A.2d 548, 556 (Del. 1964)).

65

Defendants first cite to *Polk*, a stockholder challenge to Texaco's agreement to repurchase the shares of the Bass Brothers, well-known takeover artists and greenmailers,[311] and who had acquired just under 10% of the company's stock.[312] The Bass brothers were poised to launch "some hostile . . . move" on Texaco at a time when the company was "vulnerable" because "management was consumed with . . . obtaining government and shareholder approval" of its $10 billion acquisition of Getty Oil Company—at the time, "one of the biggest corporate acquisitions in history."[313] The purchase of the Bass Brothers' shares drew multiple stockholder lawsuits. The company settled the lawsuits by agreeing to provide extensive supplemental disclosures and modify a standstill agreement that was part of the transaction.[314] This court approved the settlement over the objection of certain Texaco stockholders, and the objectors appealed.

On appeal, the high court found that the board reasonably identified a cognizable threat under *Unocal* based on the "disruptive effect and the potential long-term threat" posed by the Bass Brothers.[315] In support of this conclusion, the high court simply cited

---

[311] *See* Peter Applebome, *Texas Deal Maker: Robert M. Bass; A Younger Brother Steps Out on His Own*, N.Y. Times (June 5, 1988), https://www.nytimes.com/1988/06/05/business/texas-deal-maker-robert-m-bass-a-younger-brother-steps-out-on-his-own.html; *see also* Michael H.Q.L. Lau, *Adequate Remedies For Tender Offer Abuse: Resurrecting Manipulation and Reforming The Business Judgment Rule*, 9 U. Haw. L. Rev. 209, 216 n.59 (1987) (referring to the Bass Brothers as "examples of major investors who profited greatly in 1984 from tremendous greenmail profits").

[312] *Polk*, 507 A.2d at 533.

[313] *Id.* at 533–34.

[314] *Id.* at 535.

[315] *Id.* at 537.

*Unocal*, which involved defensive measures adopted in response to takeover activity. The high court's abbreviated reference to *Unocal* suggests that the Delaware Supreme Court credited that the Bass Brothers presented a takeover threat. The lack of more extensive analysis also is not surprising because *Polk* involved an appeal from a decision approving a negotiated settlement. The court thus applied a doubly-deferential legal standard: settlements are approved at the discretion of the trial court, and those decisions are reviewed on appeal with deference.[316] The *Polk* case does no validate a generalized concern about activism as a threat that supports a defensive response.

Defendants next cite to *Cheff*, where the board of Holland Furnace Company ("Holland") rejected a merger proposal from Arnold H. Maremont of Maremont Automotive Product, Inc. ("Motor Products").[317] Unbeknownst to the Holland board at the time, Motor Products had acquired a large block of Holland shares on the open market, and after Holland rebuffed Maremont's merger proposal, Maremont began using his stock holding to agitate for control and a restructuring of the company. He demanded that he be named to the Holland board, "threat[ened] to liquidate the company," and threatened to "substantially alter" Holland's sales force, which Holland viewed as a "vital factor in the company's success."[318] Maremont's threats caused *operational* disruption—"substantial

---

[316] *Polk*, 507 A.2d at 536 (observing that "our standard of review is whether under all the facts and circumstances the Chancellor abused his discretion" and "we must find the evidence so strongly to the contrary as to amount to an abuse of discretion" (citing *Rome v. Archer*, 197 A.2d 49, 54 (Del. 1964)).

[317] *Cheff*, 199 A.2d at 551–53.

[318] *Id.*

67

unrest . . . among the employees" that caused twenty-five of the Holland's "key men" to resign.[319]

As in *Polk*, the Holland board responded to Maremont's activity by repurchasing his shares at a premium, and the repurchase precipitated derivative stockholder actions alleging that the repurchase constituted a breach of fiduciary duties.[320] The trial court held in the plaintiffs' favor. On appeal, the Supreme Court found that the Holland board acted with justification in response to a reasonable threat to Holland's existence: "[T]he board . . . believed, with justification, that there was a reasonable threat to the continued existence of Holland, or at least existence in its present form, by the plan of Maremont to continue building up his stock holdings."[321] Like *Polk*, *Cheff* did not involve generalized concern about activism. It involved a concrete takeover attempt and a specific and on-going threat.

Defendants further cite to *Yucaipa*, where Ron Burkle's activist hedge fund Yucaipa had acquired a 17.8% stake in Barnes & Noble and disclosed in its 13D that it might acquire as much as 50%.[322] Another hedge fund with a history of piggybacking on Yucaipa's investments increased its stake from 6.37% to 17.44% of the company.[323] In response, the

---

[319] *Id.* at 551–52.

[320] *Id.* at 552–53.

[321] *Id.* at 556.

[322] *Yucaipa*, 1 A.3d at 318, 323.

[323] *Id.* at 324–25.

company adopted a pill with a 20% threshold while grandfathering the 30% stake of the company's founder and CEO.[324] Yucaipa brought litigation challenging the pill.

After trial, the court upheld the pill under *Unocal*. When evaluating the first prong of *Unocal*, the court found that the board acted with justification in response to the threat of a "creeping acquisition" and that the pill was a reasonable response.[325] Like *Polk* and *Chef*, *Yucaipa* involved a specific takeover attempt—there through a creeping acquisition—that manifested as a concrete threat. Nothing in *Yucaipa* validates a general concern regarding stockholder activism.

Defendants lastly cite to *Third Point*, as case that resembles *Yucaipa*. Dan Loeb's activist hedge fund Third Point acquired just under 10% of Sotheby's stock, publicly filed a "poison pen" letter decrying various board decisions, began spreading rumors that he intended to replace management, and launched a proxy contest to replace three incumbents on Sotheby's twelve-person board.[326] Sotheby's also detected "several hedge funds" in addition to Third Point "accumulating its stock simultaneously."[327] Sotheby's board adopted a pill with a 10% threshold.[328] Loeb requested a waiver of the pill, which the board refused.[329] Third Point brought litigation challenging the adoption and refusal to waive the pill and sought to preliminarily enjoin the annual meeting pending resolution of its claims.

---

[324] *Id.* at 320–21.

[325] *Id.* at 352–53, 359–60.

[326] *Third Point*, 2014 WL 1922029, at *6–9.

[327] *Id.* at *17.

[328] *Id.* at *10.

[329] *Id.* at *14.

On a decision denying the motion for preliminary injunction, this court concluded that the plaintiffs were not likely to succeed on their claims. When evaluating the first prong of *Unocal*, the court found that the board was justified in adopting the pill for the purpose of defending against "creeping control."[330] The court acknowledged, however, that the creeping-control threat was no longer present when the board determined not to waive the pill at Loeb's request. By that time, the threat had morphed into a concern that Third Point would improperly exercise "effective, rather than explicit, negative control" as Sotheby's largest stockholder.[331] The court cautioned against viewing "effective negative control" as "a license for corporations to deploy defensive measures unreasonably" and observed that the circumstances in *Third Point* rendered the threat legitimate in part because Loeb had acted in an "aggressive and domineering manner."[332] *Third Point* thus involved a specific takeover attempt that started as an effort to obtain creeping control. The *Third Point* decision does not validate a general concern about activism as a legitimate threat.

None of these decisions support the notion that generalized concern about stockholder activism constitutes a cognizable threat under *Unocal*. Rather, these cases demonstrate that a board has authority to respond to a specific takeover attempt, even when the attempt does not involve a traditional tender offer. Read broadly, the cases support the proposition that a Board can adopt defensive measures in response to concrete action by a

---

[330] *Id.* at *17.

[331] *Id.* at *22.

[332] *Id.*

70

stockholder activist. The Board's general concern about stockholder activism is insufficient.

### ii. Short-Termism and Distraction

The Board's second concern was that activists might pursue short-term agendas or disrupt or distract management. The "short-termism" justification refers to the concern that "a particular activist seeks short-term profit without regard to the impact on the company's long-term prospects."[333] The "disruption" justification typically refers to the concern that the actions of the activists might cause operational disruption, as in *Cheff*. Here, the Director Defendants instead frame this concern as a desire to insulate the management team from distraction.[334]

No case has evaluated under *Unocal* whether these types of particularized activist concerns constitute cognizable threats. The threats validated in Defendants' four cases discussed above involved threats that differed materially from the factual context here.

Each of Defendants' cases, unlike this case, involved takeover threats. In *Polk*, the Bass Brothers had obtained a substantial equity stake in the company.[335] In *Cheff*, an

---

[333] *Anti-Activist Poison Pills* at 931 (internal quotation marks omitted).

[334] *See supra* notes 269, 271, 275, 294, 295 and accompanying text.

[335] *See Polk*, 507 A.2d at 533–34. As discussed above, the *Polk* court found the "disruptive effect and the potential long-term threat" posed by a stockholder as cognizable under the first prong of *Unocal*. *Id*. at 537. Although this passing language seems supportive of Defendants' position, the facts of this case reveal that the board of Texaco acted in response to a takeover threat. Also, the court's reasoning on this point was underdeveloped, perhaps because *Unocal* was nascent and the court was applying a highly deferential legal standard. Consequently, this court does not view reference to a "potential long-term threat" and "disruptive effect" in *Polk* as supporting of a holding that such threats standing alone are cognizable under Delaware law. *See id.*

71

acquirer had made a merger proposal and acquired a substantial bock, then used that block to advocate for a takeover, resulting in operational disruptions were so severe as to threaten the corporation's existence.[336]   In *Yucaipa* and *Third Point*, the directors responded to creeping takeovers, which in *Third Point* could have left the activist with "effective negative control."[337]   None of the cases involved a response to activism *per se*.[338] Moreover, each of Defendants' cases, unlike this case, involved defensive measures adopted in response to a specific activist or group of activists.   The threat was not hypothetical.[339]

Reasonable minds can dispute whether short-termism or distraction could be deemed cognizable threats under Delaware law.  These sorts of justifications, particularly short-termism, are conspicuous in the policy debate,[340] but they become nebulous when

---

[336] *Cheff*, 199 A.2d at 551, 556.

[337] *See Third Point*, 2014 WL 1922029, at \*21–22; *Yucaipa*, 1 A.3d at 352–53.

[338] *See, e.g., Anti-Activist Poison Pills* at 934–36 (discussing the presence of "creeping control" concerns in *Third Point* and *Yucaipa*).

[339] *See Third Point*, 2014 WL 1922029, at \*18, 21–22; *Yucaipa*, 1 A.3d at 348; *Polk*, 507 A.2d at 537; *Cheff*, 199 A.2d at 551–52, 556.  Although *Cheff* was decided in 1964, over twenty years before *Unocal*, it was cited favorably in *Unocal* and thus bears continued relevance on the application of intermediate scrutiny.  *See Unocal*, 493 A.2d at 953–54 (citing *Cheff* for the proposition that, when adopting defensive measures, "a Delaware corporation may deal selectively with stockholders, provided the directors have not acted out of a sole or primary purpose to entrench themselves in office").

[340] *See, e.g.*, Martin Lipton, *The Threat to the Economy and Society from Activism and Short-Termism Updated*, Harv. L. Sch. F. on Corp. Governance (Jan. 27, 2015) https://corpgov.law.harvard.edu/2015/01/27/the-threat-to-the-economy-and-society-from-activism-and-short-termism-updated/; Leo E. Strine, Jr., *One Fundamental Corporate Governance Question We Face:  Can Corporations Be Managed For The Long Term Unless their Powerful Electorates Also Act and Think Long Term?*, 66 Bus. Law. 1 (2010). *See generally Anti-Activist Poison Pills* at 930.

viewed through a doctrinal lens. The central criticism of short-termism is that "shareholders who favor short-termism . . . are hurting themselves as much as they are hurting their fellow shareholders."[341] This is a valid policy argument, but as one group of scholars have commented, the "'short-termism' argument just particularizes the concern that shareholders will cast votes in a mistaken assessment of their own best interests."[342] That is, short-termism and distraction concerns boil down to the sort of we-know-better justification that Delaware law eschews in the voting context.

Although there is room to disagree as to whether short-termism or distraction could be deemed cognizable threats under Delaware law, this decision does not resolve that issue. Even if justifications of short-termism or disruption could rise to the level of a cognizable threat, hypothetical versions of these justifications cannot. The concerns in this case are raised in the abstract—there is no "specific, immediate" activist play seeking short-term profit or threatening disruption.[343] When used in the hypothetical sense untethered to any concrete event, the phrases "short-termism" and "disruption" amount to mere euphemisms for stereotypes of stockholder activism generally and thus are not cognizable threats.

---

[341] *Anti-Activist Poison Pills* at 931–32.

[342] *Id.* at 931.

[343] Trial Tr. at 544:12–15 (Buese) ("No, there was no actual threat. From our perspective, it was a perceived threat . . . .").

### iii. Rapid Accumulation of Stock

The third justification for the Plan is the concern that activists might rapidly accumulate over 5% of the stock and the belief that the Plan could serve as an early-detection devise to plug the gaps in the federal disclosure regime.

In his March 2015 Harvard Business Review article, *Corporate Governance 2.0*, Professor Subramanian advocates for boards of public companies to adopt what he calls an "advance notice" pill with a 5% threshold.[344]  He argues that "when an activist investor threatens a proxy contest or a strategic buyer makes a hostile tender offer," boards often react with a "no-holds-barred, scorched-earth" defense rather than providing stockholders with an "orderly shareholder voice."[345]  As a contributing factor to this problem, he cites "lightning strike attacks," which are rapid, undetected accumulation of stock in a short period of time, the precise concern articulated by the Board in this action.[346]  *Corporate Governance 2.0* cites to one instance of a lightning-strike raid in 2010 involving J.C. Penney, where two activist groups acquired more than a quarter of the company's shares before the ten-day disclosure requirement expired.[347]

Lightning strikes go undetected under the federal disclosure regime, which requires stockholders to disclose their ownership position after crossing the 5% threshold but gives

---

[344] JX-169 ("*Corporate Governance 2.0*") at 15.

[345] *Id.* at 12–14.

[346] *Id.* at 15.

[347] *Corporate Governance 2.0* at 14–15.  The J.C. Penney anecdote demonstrates that lightning-strike attacks can happen, though the record lacks empirical evidence of their frequency or likelihood generally or Williams' susceptibility to such an event.

74

stockholders ten days to do so. The federal disclosure regime does not prohibit stockholders from continuing to acquire stock during that ten-day period and does not capture "wolf pack" activity.[348]

To avoid lightning strikes and promote an "orderly shareholder voice," Subramanian recommends that boards effectuate a private-ordering response in the form of an advance-notice pill.[349] A similar private-ordering solution to perceived defects in the federal disclosure regime was endorsed by Professors John Coffee and Dairus Palia in their Spring 2016 article, *The Wolf at the Door: The Impact of Hedge Fund Activism on Corporate Governance* ("*Wolf at the Door*").[350] This decision refers to the private-ordering solutions discussed in both *Corporate Governance 2.0* and *Wolf at the Door* as "gap-filling pills."

This decision need not address whether a true gap-filling pill would be permissible. As discussed below, the features of the Plan are more extreme than any of the gap-filling pills discussed in *Corporate Governance 2.0* or *Wolf at the Door*. At this stage of the analysis, the question is whether the desire to fill gaps in federal disclosure laws through private ordering constitutes a legitimate corporate objective under *Unocal*. A related question is whether the gap-filling objective becomes more viable in the face of market

---

[348] *Corporate Governance 2.0* at 15.

[349] *Id.*

[350] John C. Coffee, Jr. & Darius Palia, *The Wolf at the Door: The Impact of Hedge Fund Activism on Corporate Governance*, 41 J. Corp. L. 545, 601–02 (2015).

uncertainty or a precipitous stock drop resulting in a stock price that undervalues the corporation.

Reasonable minds can dispute whether a gap-filling purpose standing alone is a legitimate corporate purpose under *Unocal*. The main concern is that if gap filling were a legitimate corporate objective that justified the adoption of a poison pill, then all Delaware corporations subject to the federal disclosure regime would have a ready-made basis for adopting a pill. These policy concerns are only slightly mitigated by a precipitous stock drop, which is not an uncommon occurrence.

Recognizing an omnipresent justification for poison pills would constitute a dramatic turn in Delaware law, which has consistently held that a pill's adoption and maintenance raises concerns sufficient to give rise to enhanced scrutiny. This court routinely views poison pills as situationally specific defenses and has conducted fact-intensive inquiries to determine whether the action is justifiable under the unique circumstances of the case. Put differently, Delaware law has handled these "nuclear weapon[s] of corporate governance" with the delicacy they deserve.[351] Delaware's approach has created an appropriate culture of caution in the board room. For example, last year prominent defense firms recommended against the reflexive adoption of a pill in response to COVID-19, noting the need for "[c]ompany-specific circumstances as well as indicia of emerging or present threats" to justify a pill's adoption.[352]

---

[351] *See* Trial Tr. at 53:18–55:10, 114:10–12 (Cogut).

[352] *See, e.g.*, David Katz & Sebastian V. Niles, *Rights Plans ("Poison Pills") in the COVID-19 Environment—"On the Shelf and Ready to Go"?*, Harv. L. Sch. F. on Corp. Governance (Apr. 2, 2020), https://corpgov.law.harvard.edu/2020/04/02/rights-plans-

Just as this decision need not decide in the abstract whether a gap-filling pill is permissible, this decision also need not address whether gap-filling represents a legitimate corporate objective. This decision instead assumes for the purposes of analysis that gap filling to detect lightning strikes at a time when stock price undervalues the corporation is a legitimate corporate purpose under the first prong of *Unocal*. The question becomes whether the adoption of the Plan was a proportional response to that assumedly valid threat.

### 2.    The Proportionality of the Response

Because Plaintiffs do not claim that the Plan is coercive or preclusive,[353] the second prong of the *Unocal* inquiry requires the court to evaluate whether Defendants proved that adopting the Plan fell within a range of reasonable responses to the lightning-strike threat posed.[354]

The thirty-thousand-foot view looks bad for Defendants. As Morgan Stanley advised the Board at the March 19 Meeting, the 5% trigger alone distinguished the Plan; only 2% of all plans identified by Morgan Stanley had a trigger lower than 10%.[355] Even among pills with 5% triggers, the Plan ranked as one of only nine pills to ever utilize a 5%

---

poison-pills-in-the-covid-19-environment-on-the-shelf-and-ready-to-go/ (issuing general guidance to companies initially responding to the COVID-19 pandemic).

[353] Plaintiffs failed to brief and thus waived these arguments. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."); *accord. Adams v. Calvarese Farms Maint. Corp.,* 2010 WL 3944961, at \*21 (Del. Ch. Sept. 17, 2010) ("Because [plaintiff] did not address these items in her post-trial briefs or otherwise cogently present evidence and argument regarding them in connection with the trial, she has waived them.").

[354] *See Unitrin*, 651 A.2d at 1387–88 (quoting *Paramount*, 637 A.2d at 45–46).

[355] JX-57 at 4 (noting that "[n]o precedents exist below 5%").

trigger outside the NOL context.[356]  Among Delaware corporations, it was one of only two. The other Delaware corporation to adopt a 5% trigger for a non-NOL pill did so in distinguishable circumstances—in the face of a campaign launched by an activist who held 7% of the company's outstanding shares at the time the pill was adopted.[357]  Of the twenty-one pills adopted between March 13 and April 6, 2020, only the Plan had a 5% triggering threshold.[358]  Of the twenty-one companies that adopted pills during that time, thirteen faced ongoing activist campaigns when adopting their pill.[359]

The Plan's other key features are also extreme.  The Plan's "beneficial ownership" definition goes beyond the default federal definitions to capture synthetic equity, such as options.[360]  The Plan's definition of "acting in concert" goes beyond the express-agreement default of federal law to capture "parallel conduct" and add the daisy-chain concept.  The Plan's "passive investor" definition goes beyond the influence-control default of federal law to exclude persons who seek to direct corporate policies.  In sum, the Plan increases the range of Williams' nuclear missile range by a considerable distance beyond the ordinary poison pill.[361]

---

[356] Mills Report ¶ 47.

[357] *Id.*

[358] JX-92 at 3.

[359] *Id.*

[360] *See Anti-Activist Poison Pills* at 949–50.

[361] *See* Mills Report ¶¶ 35, 47 ("Among the COVID Pills, the Williams Pill is by far the most restrictive.  The Williams Pill contains a suite of features that, in combination, appears to be unprecedented.").

The fact that the Plan's features depart from the default federal disclosure regulations is consistent with a gap-filling purpose, but the Plan's features do not compare well against those of gap-filling pills. As discussed above, in 2015 and 2016, Professor Subramanian in *Corporate Governance 2.0* and Professors Coffee and Palia in *Wolf at the Door* each endorsed different versions of a gap-filling pill. The Plan's features exceed what commentators have proposed.

Professor Subramanian described one gap-filling pill in *Corporate Governance 2.0*. His advance-notice pill had a 5% threshold tempered by an exemption for stockholders that disclose their position within two days of crossing the threshold.[362]

The authors of *Wolf at the Door* discuss two gap-filing pills. The first proposal is a "standing" poison pill that defines a "group" more broadly than the express-agreement default of federal disclosure law.[363] This standing pill would "preclude any shareholder—with some possible exemption for 'passive' shareholders—from exceeding a specified level (either 15% or possibly 10%)" and would include an "acting in concert" provision defined broadly so as to capture persons acting "'in conscious parallelism' with the leader of the 'wolf pack.'"[364] The authors observe, however, that the standing pill "will create considerable uncertainty and place high demands on courts."[365]

---

[362] *Corporate Governance 2.0* at 15. Although the article is silent as to the pill's other features, one can assume that the designer had parallel-conduct AIC provisions and other expansive features in mind. *See* Subramanian Report ¶¶ 37–39, 50, 81.

[363] *Wolf at the Door* at 601–02.

[364] *Id.*

[365] *Id.* at 602.

The authors' second proposal is a window-closing pill, which builds off of a proposal made in 2010 by a New York law firm following the J.C. Penney lightning-strike attack.[366] This pill would maintain the express-agreement acting in concert default of the federal disclosure regime but include a lower trigger threshold "of as little as 5.1% of the target's stock if the acquirer did not file a Schedule 13D *before* purchasing stock in excess of the specified threshold."[367] The window-closing pill "has a limited objective . . . of compelling disclosure so that a board of directors, stockholders and the trading markets

---

[366] *See id.*; Peter S. Golden, *The Window Closing Pill – One Response to Stealth Stock Acquisitions*, Harv. L. Sch. F. on Corp. Governance (Jan. 6, 2011), https://corpgov.law.harvard.edu/2011/01/06/the-window-closing-pill-one-response-to-stealth-stock-acquisitions/ [hereinafter *The Window Closing Pill*]. The concept of a window-closing pill has been endorsed by commentators, including former Chief Justice Strine in his extra-judicial writing. *See* Leo E. Strine, Jr., *Who Bleeds When the Wolves Bite?: A Flesh-and-Blood Perspective on Hedge Fund Activism and Our Strange Corporate Governance System*, 126 Yale L.J. 1870, 1963–64 (2017); Arthur Fleischer, Jr., Alexander R. Sussman & Gail Weinstein, *Takeover Defense: Mergers and Acquisitions* § 5.01[A][1] (8th ed. 2018) (describing the window-closing pill as "essentially benign, since the acquiror is not precluded from acquiring more than 5% of the target's outstanding voting securities once position disclosure has been made"); Simon M. Lorne and Joy Marlene Bryan, 11A *Acquisitions & Mergers: Negotiated and Contested Transactions* § 5:68.60 (2020) ("The plan is benign because the acquirer is not precluded from acquiring more than a five percent voting or financial interest in a company and it would not create an impediment to purchasing shares pursuant to a tender offer."); William R. Tevlin, Note, *The Conscious Parallelism of Wolf Packs: Applying the Antitrust Conspiracy Framework to Section 13(D) Activist Group Formation*, 84 Fordham L. Rev. 2335, 2349 (2016) (noting that "corporations may utilize" a window pill "to fight off wolf packs"). *But see* Maria Lucia Passador, *The Woeful Inadequacy of Section 13(D): Time for a Paradigm Shift?*, 13 Va. L & Bus. Rev. 279, 295 (2019) (commenting that "shortening the reporting window would affect the ability of investors to launch campaigns for corporate control, reducing the staggering profits accumulated as a result of their toehold, and making the accumulation of shares more expensive").

[367] *Wolf at the Door* at 602 (emphasis added).

can evaluate the ownership position of a substantial non-passive investor."[368] As originally conceived, the window-closing pill would have a "transitory five plus percent flip-in trigger," meaning that it is only triggered if a stockholder exceeds 5% ownership within the ten-day window before disclosing the triggering acquisition.[369]

The authors recognize that the window-closing pill too "would be subject to legal challenge" and would "anger the proxy advisors (who would then recommend that institutions withhold their votes for the directors of this corporation)."[370] Accordingly, they identify a series of "compromises" designed to mitigate the impact of the window-closing pill.[371] For example, the window-closing pill "might compensate for its short fuse by allowing the bidder to accumulate a greater level of stock (say, 15 or 20%), so long as it filed with the SEC immediately after crossing 5%."[372] Alternatively, it "might permit a 100% bid to be made" upon the bidder's disclosure.[373] In the authors' view, "[e]ither concession should lead the Delaware courts to accept such a pill because neither pill is 'preclusive.'"[374]

---

[368] *The Window Closing Pill*.

[369] *Id.*

[370] *Wolf at the Door* at 602.

[371] *Id.*

[372] *Id.*

[373] *Id.*

[374] *Id.* (quoting *Unitrin*, 651 A.2d at 1387).

The Plan includes more aggressive features than any of the gap-filling pills. The standing pill includes a higher trigger threshold of "either 15% or possibly 10%."[375] The window-closing pill contemplates a comparable threshold ("as little as 5.1%."), but a less inclusive acting-in-concert provision (an express-agreement provision).[376] To that structure, the authors recommended a series of potential compromises. Even the most extreme of the gap-filling pills, the advance-notice pill, contemplates an exemption for "shareholders that disclosed their positions within two days of crossing the threshold."[377]

Had the Board desired to close some of the gaps in the federal disclosure regime, the Board might have considered one of the less extreme options aimed at detection and designed to compel stockholder disclosure. Instead, the Board selected a Plan with features that went beyond those of gap-filling pills. Regardless of whether the Board intended to gap fill federal disclosure regulations—and whether that intent is permissible—the Plan's combination of features created a response that was disproportionate to its stated hypothetical threat.

The Plan's features also raise concerns when evaluated independently and divorced from comparisons. As Plaintiffs' proxy solicitor testified at trial, the Plan's combination of features are likely to chill a wide range of anodyne stockholder communications.[378]

---

[375] *Id.* at 601–02.

[376] *Id.* at 602.

[377] *Corporate Governance 2.0* at 15.

[378] *See* Trial Tr. at 209:7–23, 231:6–14, 233:4–11, 255:7–12 (Mills); *see also* Mills Report ¶¶ 55–56, 64–68, 73 (describing various forms of pre-proxy contest stockholder activism that the Plan's combination of features deters).

Although the 5% trigger is a marked departure from market norms, it is not the most problematic aspect of the Plan, because a 5% ownership limit still permits an activist to buy a larger dollar value toehold in Williams than the vast majority of other poison pills with higher triggers.[379] The primary offender is the AIC Provision, whose broad language sweeps up potentially benign stockholder communications "relating to changing *or influencing* the control of the Company."[380] The definition gives the Board discretion to determine whether "plus" factors as innocuous as "exchanging information, attending meetings, [or] conducting discussions" can trigger the Plan.[381] This language encompasses routine activities such as attending investor conferences and advocating for the same corporate action.[382] It gloms on to this broad scope the daisy-chain concept that operates to aggregate stockholders even if members of the group have no idea that the other stockholders exist.[383]

In their 2019 doctrinal and policy analysis of anti-activist poison pills, Professors Marcel Kahan and Edward Rock express concerns over the breadth of a nearly acting-in-concert provision.[384] In their view, "wolf-pack provisions suffer from two fatal flaws, each

---

[379] *See* Trial Tr. 369:15–371:20, 377:9–24 (Subramanian).

[380] *See* JX-69 at 18 (emphasis added).

[381] *Id.*

[382] Trial Tr. at 190:8–14, 196:2–15, 266:8–267:5 (Mills); Mills Report ¶¶ 58–59.

[383] *See* Trial Tr. 103:14–18 (Cogut) (agreeing that stockholders have no way to know with any certainty with whom they are aggregated); *id.* 608:4–610:14 (Buese) (same); Fuller Dep. Tr. at 139:24–140:6 (same).

[384] *See Anti-Activist Poison Pills* at 962–66. In a blog posted at the beginning of the pandemic and after Williams had adopted the Plan, Professor Rock wrote that the pandemic presented "a time to put the ordinary debate [about rights plans] aside" and for stockholders

of which would on its own be sufficient to render them invalid."[385]  First, they "do not clearly specify what activities would result in aggregation."[386]  Key terms like "parallel," "relating to," and "influencing" are hard to apply, and "plus factors like 'exchanging information' and 'attending meetings'" are quite broad.[387]  "Because triggering a pill would have severe adverse consequences, such vague provisions would have a chilling effect on an activist's ability to communicate with other shareholders."[388]  Second, "the very purpose of wolf-pack provisions—to make illicit parallel actions that are not the product of an agreement—is based on a fundamental misconception of how shareholders *ought* to interact."[389]  Expounding on this last criticism, the authors explain that "[t]hese sorts of

---

and proxy advisory firms "to provide boards with space to respond to the multiple challenges of protecting firms, employees, consumers, and the country" without "worrying that they will soon find an activist on their doorstep demanding answers."  JX-94 at 2–3.  Professor Rock then forwarded this blog to Cogut.  *Id.* at 1.  Defendants treat this exchange as a recantation of the conclusions drawn by Professors Kahan and Rock in their 2019 article, but that is an exaggeration.  Professor Rock's blog is best understood as an appeal to activists and boards alike to use common sense during a global emergency.  *See, e.g.*, *id.* (cautioning that "boards shouldn't take advantage of this crisis to erect entrenched defensive measures like staggered boards that shareholders have clearly rejected").

[385] *Anti-Activist Poison Pills* at 964.

[386] *Id.*

[387] *Id.*

[388] *Id.*; *see also In re Versum Materials, Inc. S'holder Litig.*, C.A. No. 2019-0206-JTL, at 53–54 (Del. Ch. July 16, 2020) (TRANSCRIPT) (expressing concern over the breadth of a nearly identical AIC provision and explaining:  "What the act[ing]-in-concert provision attempts to cut off, or at least threaten, is all of the activities that lead up to the giving of the revocable proxy or the making of the revocable tender.  So it nominally preserves the end product . . . but . . . interdicts all of the preliminary steps that lead to the customary rendering of that proxy . . . .").

[389] *Anti-Activist Poison Pills* at 964.

provisions threaten to chill the sort of shareholder interaction upon which sound corporate governance depends and that decades of reform have sought to encourage."[390]

To illustrate both fatal flaws and the effect of wolfpack provisions on stockholder activity, the authors present a hypothetical about Remus and Lupin, which this decision takes the liberty of altering to illustrate the same points.[391] Imagine that Remus and Lupin each own 3% of Williams stock. Each is aware of the other's activities solely from rumors and public disclosures. Remus sends a letter to Williams asking for ESG initiatives and threatening to buy up stock and run a proxy contest if the Board does not adopt his proposal. Lupin has reviewed and agrees with Remus's proposal.

Can Lupin meet with the Board, Remus, or other Williams stockholders to discuss Remus's ESG proposal without triggering the Plan? Probably not. Can Remus communicate with other stockholders to determine whether there is support for his ESG proposal before launching the proxy context without fear of triggering the Plan? Not without risk of aggregating those stockholders under the AIC Provision.

Defendants have a few responses to these criticisms of the AIC Provision. First, they say that the Plan does not preclude any stockholder from launching a proxy contest, and that "[a]ny purported impact the Plan might have on routine activism, short of a proxy contest, is irrelevant under *Unocal*."[392] That argument misunderstands the proportionality inquiry of *Unocal*, which is not limited to the analysis conducted in *Moran*; rather, the

---

[390] *Id.* at 964–65.

[391] *See id.* at 965.

[392] Defs.' Opening Br. at 43.

proportionality analysis is tied to a pill's purpose, and with new purposes come new considerations.[393] Moreover, as Plaintiffs' expert opined, activity leading up to a proxy contest can impede a stockholder's ability to launch a proxy contest by cutting off private communications in advance of proxy contests.[394] Mills explained that stockholders frequently "take the temperature" of other stockholders in advance of launching a proxy contest in light of the risk of financial and reputational damage resulting from a failed contest.[395]

Second, Defendants observe that the AIC Provision is limited to actions that "relating to changing or influencing control" of Williams.[396] Defendants contend that most routine forms of stockholder activism do not involve changing or influencing control of a company. Defendants argue that the AIC Provision contains several other "guardrails" limiting its applicability even when stockholders' do act in ways "relating to changing or

---

[393] *See, e.g., eBay*, 16 A.3d at 31 (stating that "[t]he intermediate standard of review is not limited to the historic and now classic paradigm").

[394] *See generally* Trial Tr. at 190:3–14, 212:10–13, 276:9–277:10 (Mills); *see also* Mills Report ¶¶ 64–66.

[395] Mills Report ¶ 64. Defendants' expert proxy solicitor disputes these conclusions. In his view, the AIC Provision would not substantially impede a stockholders' ability to obtain information to assess the likelihood of success before launching a proxy contest. Goldfarb Report ¶ 45. Goldfarb argues that proxy solicitors could aid in this effort, in part by reaching out stockholders who fall within the definition of "passive investor." *Id.* Goldfarb was a highly qualified and credible witness, but this aspect of his testimony ignores the possibility that proxy solicitors would trigger the daisy chain provision, *see* Trial Tr. 196:16–197:8 (Mills), and relies on a definition of "passive investor" that this decision has rejected.

[396] Defs.' Opening Br. at 47, 51; Trial Tr. at 566:23–567:19 (Buese); *id.* 396:10–16 (Subramanian).

influencing control" of the Company.[397] To echo the concerns of Professors Kahan and Rock, however, terms like "relating to" and "influencing," along with the other broad guardrails, are nebulous and broad. Moreover, Cogut conceded at trial that facts similar to the above hypothetical would change or influence control of a company and be included within the AIC Provision.[398]

Third, Defendants argue that the Board would never trigger the Plan in response to an activist play like the Remus Lupin hypothetical.[399] They describe such an outcome is "farfetched," and they say that the court should not presume that the Board would misuse its power under the Plan.[400] But this line of logic would excuse nearly any combination of poison pill terms and does not support a finding that the Plan's terms were reasonable in relation to the threat posed.[401] It also provides cold comfort to Remus and Lupin, and

---

[397] Defs.' Opening Br. at 52–54.

[398] Trial Tr. 169:20–170:20 (Cogut).

[399] *See* Defs.' Opening Br. at 49–52.

[400] Defs.' Opening Br. at 49 (quoting Trial Tr. at 254:13–258:4 (Mills) ("[I]t might be farfetched that they would trigger. But it's not farfetched that they would call [an activist] on their behavior and say, 'look what our pill says and look what you're doing. . . . [Y]ou should shut up or bring your position below 5 percent.'")).

[401] Defendants' argument overlooks the stifling impact the Plan has on stockholder communications, a chilling effect that exists whether the Board triggers the Plan or not. *See, e.g., id.*; Mills Report ¶¶ 68, 73 (concluding that the Plan is likely to stifle normal stockholder communications); Mills Rebuttal Report ¶¶ 48–51 (concluding that the "guardrails" in the AIC Provision place investors at the mercy of the Board's broad discretion, noting that Board discretion and after-the-fact litigious remedies don't "address or mitigate the current chilling effect of the Wolfpack Provisions on stockholder activism and the free exercise of the stockholder franchise").

87

stockholders like them, who cannot rely on the Board's benevolence and must regulate their behavior based on what the Board could do.[402]

The Passive Investor Definition sets another easily activated tripwire. Mills cites to a concrete example of this concern. On the day the Plan was announced, a representative of BlackRock, which holds over 5% of Williams' outstanding common stock [and a 13G filer], criticized Williams for failing to be fully transparent concerning the adoption of the Plan, stating "[t]his doesn't look good from an ESG perspective."[403] This email reflects BlackRock "exercising the power to direct or cause the direction of the management and policies of the Company" and thus excludes BlackRock from the Passive Investor Definition.[404] While it is probably true that the Board would exempt Blackrock and not risk angering a major stockholder player, other stockholders may not be so fortunate.

In the end, Defendants "bear the burden to show their actions were reasonable."[405] They have failed to show that this extreme, unprecedented collection of features bears a

---

[402] *See, e.g., id.*; Mills Report ¶¶ 68, 73 (concluding that the Plan is likely to stifle normal stockholder communications); Mills Rebuttal Report ¶¶ 48–51 (concluding that the "guardrails" in the AIC Provision place investors at the mercy of the Board's broad discretion, noting that Board discretion and after-the-fact litigious remedies don't "address or mitigate the current chilling effect of the Wolfpack Provisions on stockholder activism and the free exercise of the stockholder franchise").

[403] JX-73 at 3.

[404] *See* JX-69 at 22.

[405] *Mercier*, 929 A.2d at 807 (citing *Unocal*, 493 A.2d at 955); *eBay*, 16 A.3d at 35 (holding that where a rights plan "falls outside the range of reasonableness" the defendants fail "to meet their burden of proof under the second prong of *Unocal*"); *accord Air Prods.*, 16 A.3d at 92, 113 (holding that "the target board must show . . . that any board action . . . is 'reasonable in relation to the threat posed'" and that the "Defendants bear the burden of showing that their defenses . . . fall within a 'range of reasonableness.'" (quoting *Unitrin*,

reasonable relationship to their stated corporate objective. Because Defendants failed to prove that the Plan falls within the range of reasonable responses, the Plan is invalid.

## III. CONCLUSION

For the foregoing reasons, judgment is entered in favor of the certified class declaring the Plan unenforceable and permanently enjoining the continued operation of the Plan. Having concluded that the Plan is unenforceable because the Director Defendants breached their fiduciary duties under *Unocal* when adopting it, this decision need not resolve whether the Director Defendants independently breached their fiduciary duties by failing to redeem the Plan.

---

651 A.2d at 1388)); *Yucaipa*, 1 A.3d at 331 ("[T]he board bears the burden to show that the pill is reasonable").